DEPOSITION OF MARGARET RUBINO
CONDUCTED ON TUESDAY, MAY 29, 2007

**1**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2         (Civil Division)
3    ----------------------------------------X
4    FEDERAL INSURANCE COMPANY        :
5         and                        :
6    HARTFORD CASUALTY INSURANCE COMPANY  :
7         Plaintiffs        :
8         v.              : Case No.:
9    LANDIS CONSTRUCTION CORPORATION    : 1:06CV00379
10        and               :
11   WUERSTLIN APPLIANCE SERVICE        :
12        and               :
13   MR. PAUL SCUDERI            :
14        Defendants        :
15   ----------------------------------------X
16        Deposition of MARGARET RUBINO
17        Washington, D.C.
     Tuesday, May 29, 2007
18        12:50 p.m.
19
20   Job No.: 1-103203
21   Pages 1 - 118
22   Reported by: Ellen L. Ford, RPR

**2**

1    Deposition of MARGARET RUBINO, held at the law offices
2    of:
3
4
5         ARENT FOX
6         1050 Connecticut Avenue, Northwest
7         6th Floor
8         Washington, D.C. 20036
9
10
11
12   Pursuant to agreement, before Ellen L. Ford,
13   Registered Professional Reporter and Notary Public in
14   and for the District of Columbia.
15
16
17
18
19
20
21
22

**3**

1         APPEARANCES
2
3    ON BEHALF OF PLAINTIFF HARTFORD INSURANCE INSURANCE
4    COMPANY:
5         BRIAN E. TETRO, ESQUIRE
6         WHITE & WILLIAMS, LLP
7         1800 One Liberty Place
8         Philadelphia, Pennsylvania 19103
9         (215) 864-7000
10
11
12   ON BEHALF OF DEFENDANT LANDIS CONSTRUCTION
13   CORPORATION:
14        ALLAN A. NOBLE, ESQUIRE
15        BUDOW & NOBLE, P.C.
16        Suite 500, West Air Rights Building
17        7315 Wisconsin Avenue
18        Bethesda, Maryland 20814
19        (301) 654-0896
20
21
22

**4**

1         APPEARANCES (continued)
2
3    ON BEHALF OF DEFENDANT WUERSTLIN APPLIANCE SERVICE:
4         EDWARD J. BROWN, ESQUIRE
5         McCARTHY & WILSON, LLP
6         100 South Washington Street
7         Rockville, Maryland 20850
8         (301) 762-7770
9
10   ON BEHALF OF DEFENDANT PAUL SCUDERI:
11        JOHN A. REGO, ESQUIRE
12        ANDERSON & QUINN
13        Adams Law Center
14        25 Wood Lane
15        Rockville, Maryland 20850
16        (301) 762-3303
17
18   ON BEHALF OF ERIE INSURANCE:
19        WILLIAM C. SENNETT, AIC, AIM
20        Litigation Specialist
21        Silver Spring Branch
22        (301) 680-7603

1 (Pages 1 to 4)

L.A.D.                           EOGRAPHY
(202)861-3410 (800)              3)288-0026 (410)539-3664

DEFENDANT'S
EXHIBIT
C

DEPOSITION OF MARGARET RUBINO
CONDUCTED ON TUESDAY, MAY 29, 2007

25

1   Q   Would you consider him a friend?
2   A   He's an acquaintance.
3   Q   Acquaintance. Okay.
4   A   Our children go to the same school.
5   Q   Which school is that?
6   A   Lafayette Elementary.
7   Q   Is that a D.C. public school?
8   A   Yes.
9   Q   Eventually, as I understand it, there was a
10  contract with Landis, correct?
11  A   Yes.
12  Q   And the contract that was actually signed,
13  if you need the documents to refresh yourself then
14  when they come back in -- but as I understand it, the
15  electrical work was taken out of the contract with
16  Landis, correct?
17  A   Correct.
18  Q   Why was that?
19  A   The initial bid from them, the electrical
20  work had been about, I'm talking ballpark right now,
21  around $5,000.
22  Q   Whatever it is in the proposals?

26

1   A   Right. Then when it came back the next time
2   it was close to 10. The whole job was less than
3   $50,000. So it seemed disproportionate, and also no
4   explanation for why the cost had suddenly doubled.
5   And please keep in mind that we were trying to
6   please a client who had never done this amount of --
7   this scale of renovation before. Being an elderly
8   person is used to old world prices, not current
9   prices.
10  And that was in fact why, at her insistence, we
11  were just refacing the cabinets, not taking them out
12  all together and putting in all new stuff, which any
13  sane renovator would rather do because it's actually
14  easier to just take out old rather than try to refit
15  new -- I mean, new fronts on old boxes. And so when
16  this lighting estimate came in at twice what it had
17  been --
18  Q   I'm sorry, the what estimate?
19  A   The lighting estimate, the lighting part of
20  the whole job.
21  Q   You mean the electrical?
22  A   Right. Sorry. The electrical estimate came

27

1   back at twice what it had been. Then we said well,
2   let's see if we can save a significant amount of money
3   here, and then again went to Paul Scuderi who was
4   somebody else that we knew of as being a good
5   electrician that had done a lot of work for another
6   contractor friend of ours and came highly recommended.
7   And he had a proposal that again was back closer
8   to the original number, and so Chris said, "That's
9   fine. You want to use your electrician, no problem."
10  Q   Okay. You may have touched on this. How
11  did you decide on Mr. Scuderi?
12  A   Because he had come highly recommended by a
13  good friend of ours who is a contractor who does a lot
14  of high-end renovation in the Washington area.
15  Q   Who is that person?
16  A   Charlie Sleichter.
17  Q   You'll have to spell that.
18  A   S-l -- let me write it down first.
19  S-l-e-i-c-h-t-e-r, first name Charlie.
20  Q   Did you ever deal directly with Mr. Scuderi?
21  A   I spoke with him on the telephone a couple
22  times.

28

1   Q   All right. Did you ever see him on the job?
2   A   Yes.
3   Q   When was that?
4   A   Initially when the job first -- when he
5   first came in to do his part of it.
6   Q   What did you see him do, if anything?
7   A   I don't remember.
8   Q   Was he by himself or did he have employees,
9   if you remember?
10  A   He had employees.
11  Q   Did you keep any kind of a log for this job?
12  In other words, sometimes in construction --
13  A   Daily who came in and who came out? No.
14  Q   Do you know anybody that did?
15  A   No.
16  Q   Including your husband.
17  A   Right.
18  Q   You don't know.
19  A   I don't know.
20  Q   Okay.
21  A   To my knowledge, he does not have a log.
22  Q   Okay. You know one of the issues in this

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

101

A **No.**
Q I know you didn't draft that Answer to Interrogatory, that's just how you're identified. Okay?
You mentioned that the electrician -- that there was an electrician who had worked just in the apartment area.
A **Right.**
Q But you didn't know his name or her name?
A **His name is Murphy. I don't know what his last name is.**
Q Do you know what his company name is?
A **No. He comes through Chris Wallis.**
Q Okay. To your knowledge, he's a licensed electrician?
A **Yes.**
Q Why is he specified or delegated to the apartment work as opposed to the housework?
A **Different layer of complexity. The apartments are just basically rental units, so he takes care of the rental unit stuff as opposed to the things in the main house.**

102

Q Do you know if he's ever been asked just to do a spot repair or just check something, or otherwise address any potential issue in the house as opposed to the apartments?
A **Some spot repair.**
Q What kind of stuff has he done?
A **If a dimmer switch breaks and needs to be replaced, that kind of thing.**
Q Have you ever spoken to him about this fire, Murphy, whatever?
A **Casually after the fact. He came and helped Chris Wallis do something. I think it was that the firemen -- they couldn't find the fuse box to cut the power to the building, so they actually went and cut the cable that came from the street into the building.**
**And so Murphy came and waited while the guys from the City came to hook it back up and verify that it was hooked up or something like that, but --**
Q This would be the wire that supplied the main house?
A **Yeah, and the apartment building.**
Q Well, do you know if anybody ever asked him,

103

or do you ever ask him if he had any involvement with the dishwasher, point blank?
First, did you ever ask him?
A **No, I didn't ask him, but I never -- I don't have any knowledge of him ever having any dealings with that dishwasher.**
Q But in your opinion, he would be qualified to do an electrical hookup from what you've seen him do at the other place, the apartment, that is?
A **He hooks up stoves, and I don't know if the apartments have dishwashers or not. I know that they have stoves but --**
MR. BROWN: That's all the questions I have subject to looking at these documents. I don't know, have you guys had a chance to look at them?
MR. TETRO: I'll ask three questions.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
HARTFORD INSURANCE

BY MR. TETRO:
Q Just so it's clear, again I represent Hartford who insures Mrs. Bernstein's home.
Just so it's clear, who actually retained Paul

104

Scuderi, Inc. with regard to this renovation project or refurbishing project?
A **Who what do you mean by retained?**
Q Who hired Mr. Scuderi?
A **Mrs. Bernstein did.**
Q Okay. But who actually contacted Mr. Scuderi then to get him involved with the project?
A **I did.**
Q Okay. Anyone from Landis play any role in selecting or hiring Mr. Scuderi?
A **No.**
Q Okay. And I think you testified before that you did not know who hardwired the dishwasher.
A **No.**
Q Other than Mr. Scuderi, can you think of anyone else who could possibly have done that hardwire connection?
MR. REGO: Objection; calls for speculation.
Q You can still answer.
A **Well, it was either Scuderi or Landis.**
Q Okay.

DEPOSITION OF MARGARET RUBINO
CONDUCTED ON TUESDAY, MAY 29, 2007

105

1        MR. REGO: Objection; move to strike.
2        MR. TETRO: That's all I have. You
3    want to take a break?
4    (Discussion held off the record.)
5        MR. REGO: I just have a few more
6    questions, Ms. Rubino.
7        RE-EXAMINATION BY COUNSEL FOR DEFENDANT
8                PAUL SCUDERI
9    BY MR. REGO:
10       Q   You testified there were no permits for the
11   job. My assumption with that, and correct me if I'm
12   wrong, was that there was never an intention by you,
13   your husband or Ms. Bernstein to have any inspections
14   done after this work was completed.
15       A   Correct.
16       Q   And that's also true for Landis, they didn't
17   intend to have any inspections done, correct?
18       A   Correct.
19       Q   This folder that you handed me a few moments
20   ago says, "BB kitchen 2003." Is that Beverly
21   Bernstein kitchen?
22       A   Right.

106

1        Q   The writing on the cover of this folder,
2    some of it's in pencil, some of it's in pen. Is that
3    your handwriting?
4        A   Most of it is mine, some of it is my
5    husband's.
6        Q   Can you tell me -- let me just show you
7    this. Can you tell me which of that handwriting is
8    yours versus your husband's?
9        A   This is mine, this is my husband's.
10       Q   Okay.
11           MR. NOBLE: Left, right?
12           MR. REGO: I'm going to mark the whole
13   cover.
14       Q   Before we mark it, you have the words,
15   "Branch Electric," written on this folder. Is this
16   your handwriting?
17       A   That's my husband's.
18       Q   Okay. You also have the word -- looks like,
19   "dimmers." Is that your handwriting?
20       A   This is my handwriting. Dimmers is in my
21   handwriting.
22       Q   Okay. Dimmers --

107

1        A   "Raise disposal switch." I read this to you
2    earlier. "Drywall, doorbell, hole above closet,
3    something wire phone question mark," and then
4    Scuderi's number.
5        Q   Okay. Do you know why you wrote that down
6    on the cover of that folder?
7        A   I don't know now exactly, no. It looks like
8    a list of questions from the old kitchen, sort of a
9    bit of an initial laundry list for an electrician in
10   that we wanted the light switches to be able to be
11   dimmed, the Dispose-All switch, I don't remember where
12   it used to be, but it needed to be raised because
13   wherever it was it was awkward. There was an old
14   doorbell that was in the kitchen that needed to be
15   drywalled over because it was no longer operational.
16   And the same thing with the hole above the closet.
17   There was some wire that was coming out of the wall,
18   and we didn't know what it was, needed it to be
19   identified.
20       Q   When you say that this was an initial list,
21   is this before the project started, do you know?
22       A   I don't remember.

108

1        Q   Do you know if it was a list that you
2    prepared based on things that you observed, or it's a
3    list that you prepared based on things that somebody
4    else told you?
5        A   I don't remember.
6        Q   Do you know if you ever contacted Scuderi
7    about anything on that list?
8        A   My guess is that it was a list to be raised
9    either by myself or my husband with him, but I don't
10   remember.
11       Q   Okay. And the rest of the writing on this
12   folder I take it is your husband's writing?
13       A   Yes. Except Derrick. That's mine, and I
14   don't remember who Derrick is.
15           MR. REGO: Can you mark the cover of it
16   as the next exhibit, 6?
17   (Rubino Exhibit No. 6 - folder cover - marked for
18   identification.)
19           MR. REGO: That's all I have.
20       RE-EXAMINATION BY COUNSEL FOR THE DEFENDANT
21               LANDIS CONSTRUCTION CORP.
22   BY MR. NOBLE:

27 (Pages 105 to 108)