DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 1

U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

------------------------------------:

FEDERAL INSURANCE COMPANY,            :

     and                               :

HARTFORD CASUALTY INSURANCE           :

COMPANY,                              :
               Plaintiffs          :  Case No.
v.                                    :  1:06CV00379
LANDIS CONSTRUCTION CORPORATION       :
       and                             :

WUERSTLIN APPLIANCE SERVICE           :

       and                             :

PAUL SCUDERI, INC.,                   :

         Defendants              :

------------------------------------:

Deposition of PAUL A. SCUDERI

Rockville, Maryland

Tuesday, April 10, 2007

10:21 a.m.

Job No.:  1-100149

Pages  1 - 114

Reported By:  Susan B. Fillmore, R.P.R.

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 27

1       A    I still don't understand the question, I'm

2    sorry.

3       Q    Okay.  Well, Mr. Rubino spoke with you and

4    asked you to do certain jobs at the Bernstein

5    residence, correct?

6       A    Correct.

7       Q    Were these the jobs, or was the list the

8    same list of items that another contractor had

9    provided an estimate on?

10      A    I don't know the answer to that.  I don't

11   know what the other contractor's scope of work

12   was.

13      Q    Okay.  With respect to the dishwasher

14   located in the kitchen of the Bernstein residence,

15   what, if anything, were you contracted to do with

16   regards to the dishwasher?

17      A    I was contracted to make a final

18   connection, electrical connection, on the

19   dishwasher.

20      Q    Okay, and just so the record is clear,

21   what does that mean to you when you say, to make the

22   final connection to the dishwasher?

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 44

1    sure -- are you aware of any code provision that

2    says you can't use Romex in this application.  I

3    think is what you're asking.  If I mischaracterized

4    it --

5              MR. UTKE:  No, that's the question.

6    BY MR. UTKE:

7        Q    In other words, you've indicated you err

8    on the side of safety, and obviously BX cable is

9    going to be sturdier than Romex.  But in this

10   application is it code-compliant to use Romex?

11       A    I would --

12             MR. NOBLE:  Same objection.  Go ahead.

13       A    I would say yes.  I mean, there are many,

14   many dishwashers, or any appliances, any appliances,

15   that are wired with Romex.

16       Q    Okay.  Now, the estimate that we've marked

17   as Scuderi 1, was that accepted by Mr. Rubino?

18       A    Yes, to my recollection, that was accepted

19   by Mr. Rubino.

20       Q    And just as a means of summary, he asked

21   you to do specific things at the house.  You drew up

22   a list, gave prices to it and handed him this list,

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 45

1    and he approved of it?

2        A    That is correct.

3        Q    Were you paid for the work that is listed

4    on that estimate?

5        A    Yes, I was paid.

6        Q    Were you paid the entire amount of

7    $4,855?

8        A    Yes.

9        Q    After you were in the Bernstein residence

10   and saw that the dishwasher had been connected, and

11   I'm referring to the electrical connection supplying

12   power to the unit, is there a reason why you didn't

13   tell somebody that you had been paid to do that and

14   it had been done by someone else?

15       A    Well, first I didn't personally see the

16   connection of the dishwasher.  I saw that the

17   dishwasher was operational.  Okay.  Secondly there

18   are -- there were things -- what's the best way to

19   say it.

20            The way I personally work on jobs like

21   this is that there are give and takes on items done,

22   items not done.  For instance, I installed an

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 59

1       A     And that is a standard junction box used

2    in the trade, okay.  I used it as opposed to what

3    they call a single-gang box, which is only half as

4    wide as that 1900 box, and it's cheaper, but it

5    doesn't allow for as much space inside the junction

6    box, work room I'll call it.

7              MR. UTKE:  Okay.  Let's have this marked

8    as 4.

9              (Scuderi Exhibit No. 4 marked for

10   identification and retained by counsel.)

11   BY MR. UTKE:

12      Q     Sir, we have marked as Scuderi 4 what

13   appears to be four electrical permits.  Can you tell

14   me, take a look at this document and tell me what

15   this is.

16      A     Okay, I think I have recollection that

17   there are five, that there's a separate page with

18   one.

19      Q     Well, I'll add this as the page 2 for

20   No. 4, okay.  So there's five permits total.

21      A     Yeah, these were the permits that I sent

22   in for the work done on the Bernstein residence.

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 69

1    Installed that junction box beneath the sink

2    adjacent to the dishwasher.  Installed what we call

3    the tail out of the junction box, which was the roll

4    of BX, and installed a switch on that junction box.

5         Q    Okay.  Now, would all this work be, would

6    that fall within the $60 charge on your invoice?  Or

7    was that separately itemized on the invoice?  Or

8    estimate I should say.

9         A    I think, I think it fell within the

10   estimate.

11        Q    So it would be correct for me to assume

12   that the $60 for rewire dishwasher, was for all the

13   work you just mentioned.

14        A    Yes.

15        Q    Okay.  Now, would that $60 also have

16   included to make the final connection between the

17   dishwasher and the house wiring?  Even though we

18   know that you didn't in fact do that, did you bill

19   for that, as well?

20        A    It was included in my final bill, yes.

21        Q    Okay.  If you could just pull out

22   number, I think it's E-1, the estimate.

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 83

1    ever say, what about the dishwasher?

2        A    I don't believe I did.

3        Q    Okay.  All right, if you know, did anyone

4    at the site, whether it be Mr. Rubino or anyone from

5    Landis, were they required to supervise any of the

6    work that you performed at the residence?

7            MR. NOBLE:  Objection to the form.

8        A    Would you ask that again.

9    By MR. TETRO:

10       Q    Let me rephrase it.  When you were done

11   with any of the electrical work that you did at the

12   residence, did you show it to anyone for approval or

13   their opinion about the work?

14       A    No.

15       Q    No.  So you simply finished the work and

16   that was it, or did you at least notify whoever it

17   was that the work was done?

18       A    I don't recall having notified anyone that

19   the work was done.

20       Q    Was that your typical practice, to do the

21   work and not notify anyone that the work was done?

22       A    Well, Sal would have known because --

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 84

1    well, I take that back.  I did notify Sal because

2    Sal paid me, yeah.

3         Q    Okay.  Sal paid you directly?

4         A    No, Sal initiated the check from --

5         Q    Mrs. Bernstein.

6         A    -- Mrs. Bernstein.

7         Q    Okay.  Did you subcontract any of your

8    electrical work to anyone that was not affiliated

9    with Paul Scuderi?

10        A    No.

11        Q    Just some questions about the permits.  If

12   I understand your testimony correctly, you can't

13   specify which permit applies to which appliance for

14   those that indicate permits for an appliance?

15        A    That is correct.

16        Q    Okay.  But if I also understand your

17   testimony correctly, the permits that are Exhibit, I

18   think --

19             MR. REGO:  It was 4.

20   BY MR. TETRO:

21        Q    -- 4, one of these permits would indeed

22   correspond with the work you did for the

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 96

1    and were entering, that the alarm company called

2    them to say that there was a fire in the house.

3         Q    Anything else you remember from that

4    conversation?

5         A    I'd, I'd have to think about it.

6         Q    Take your time.  I'll ask you a few more

7    questions and then I'll follow up.

8         A    Sure, sure.

9         Q    Do you know in the District of Columbia

10   whether it's the homeowner's responsibility to

11   ultimately get the work that's been performed at

12   their house approved by the District of Columbia?

13        A    Could you ask the question again.

14        Q    Do you know what the inspection and the

15   permit process is in the District of Columbia?

16        A    Yes.

17        Q    Okay.  Do you know whose -- is it the

18   homeowner's ultimate responsibility to make sure

19   that all work is approved at their home?

20        A    Usually it's the general contractor.

21        Q    Okay.  In this case the project was being

22   run by this Sal, on behalf of the homeowners?

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 97

1        A    That was my understanding.

2        Q    Do you know if he ever took steps to have

3    your work or anybody else's work approved at the

4    premises?

5        A    I don't know that.

6        Q    Okay.  All right.  And now they've had all

7    of 15 seconds, anything else you remember from that

8    conversation?

9        A    Yeah, thank you for that reprieve.

10       Q    Okay.

11       A    I do remember him saying that the

12   dishwasher had been serviced.

13       Q    Did he tell you how many times?

14       A    No.

15       Q    And anything else?

16       A    No, I think that's it.

17            MR. BROWN:  Okay, thank you.  That's all I

18   have.

19            FURTHER EXAMINATION BY COUNSEL FOR

20   PLAINTIFF FEDERAL INSURANCE COMPANY

21   BY MR. UTKE:

22       Q    I have just a follow-up question for you,

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 98

1    sir.

2         A    Sure.

3         Q    You just spoke about the permit process

4    and the inspection process for a homeowner --

5         A    Correct.

6         Q    -- for this type of work.  And you've

7    indicated that typically that goes to the general

8    contractor?

9         A    (Witness nods head.)

10        Q    Did you have an expectation that you were

11   going to pull electric permits for the electrical

12   work that was performed at the residence?

13        A    Define expectation.

14        Q    Well, did you believe it was your

15   responsibility or Mr. Rubino's responsibility to

16   pull electrical permits?

17        A    It's ultimately my responsibility to pull

18   electrical permits.  Mr. Rubino is not licensed to

19   pull electrical permits.

20        Q    Okay.  And, in fact, isn't that something

21   that you placed on your estimate because you

22   anticipated you were going to pull permits?

DEPOSITION OF PAUL A. SCUDERI
CONDUCTED ON TUESDAY, APRIL 10, 2007

Page 99

1    A    Correct.

2    Q    And so you were paid in advance to pull

3  permits for this job?

4    A    I was not paid in advance to pull permits

5  because Mr. Rubino stated that it was -- that he

6  didn't want to pull permits.

7    Q    Okay, but did you take it upon yourself,

8  then, to pull permits?

9    A    Yes, absolutely.

10    Q    Okay.  If there were any inspections

11  required for your work, would you expect that

12  Mr. Rubino was going to arrange for that inspection

13  or you were going to arrange for it?

14    A    I would have expected Mr. Rubino to.

15    Q    Would you have told him that he needed to

16  have an inspection performed?

17    A    Well, I hung the permits on the panel

18  door, so ...

19    Q    Okay.  Well, I think we might be talking

20  about two different things.  You went out and you

21  got permits.  Was there any type of inspection that

22  was required after you pulled the permit?