BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)

- - - - - - - - - - - - - - - x
FEDERAL INSURANCE COMPANY       :
and HARTFORD CASUALTY           :
INSURANCE COMPANY,
                                :
        Plaintiffs        :  Case No. 1:06CV00379
                                :
    v.                          :
                                :
LANDIS CONSTRUCTION             :
CORPORATION and WUERSTLIN       :
APPLIANCE SERVICE and           :
PAUL A. SCUDERI, INC.,          :
                                :
        Defendants        :
                                :
- - - - - - - - - - - - - - - x

**EXHIBIT 13**

            Wednesday, November 7, 2007
            Washington, D.C.

Deposition of
        CHRISTOPHER WALLIS
a witness, called for examination by counsel for the defendant Wuerstlin, pursuant to notice, held at the offices of Arent Fox, 1050 Connecticut Avenue, N.W., Washington, D.C., beginning at 2:30 p.m., before Frances M. Freeman, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 6

1 questions before you answer the question.
2     If you don't understand the question, you
3 want me to repeat, clarify, or explain the question,
4 please, do that.
5     If you don't do that, we'll take that to mean
6 you understood the question. Okay?
7   A  Okay.
8   Q  Try to keep your voice up, your answers
9 verbal. That is avoid uh-huhs and uh-uhs, if you can,
10 or gestures.
11     Try to let me finish my question before you
12 start your answer. I will try to extend that same
13 courtesy to you. That is, let you finish your answer
14 before I start my next question.
15     I don't expect this to take that long. But
16 if you need a break, you want to use the restroom, get
17 fresh air, you want to get away from the questioning
18 for a moment, that's fine. We can do that as many
19 times as you deem fit within reason.
20     Just try to finish the question and answer
21 that we're on before any breaks are taken.
22   A  Understood.

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 7

1   Q  What is your profession, sir?
2   A  I'm a property manager.
3   Q  And who is your employer?
4   A  The Fred A. Smith Company.
5   Q  And how long have you been with them?
6   A  I have been with them a total of 17 years. I
7 was out for two.
8   Q  What two years were those?
9   A  1999 through 2001.
10   Q  And why?
11   A  I went to another management company and then
12 went back as a partner.
13   Q  Before you were with Fred A. Smith, the Fred
14 A. Smith Company, who did you work for?
15   A  Prior to that, I worked in a hotel, the
16 Talbert Inn.
17   Q  Where is that?
18   A  On N Street, Northwest. 1700 block.
19   Q  What did you do there?
20   A  I was the manager.
21   Q  Did you have any property management jobs
22 before Thomas A. Smith?

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 8

1   A  Before the --
2   Q  I'm sorry, the Fred A. Smith Company?
3   A  No.
4   Q  Where did you obtain your experience,
5 training, education and property management?
6   A  When I started with the Fred A. Smith, I was
7 mostly sales, and then started doing a few houses. As
8 part of sales, you do leasing of houses. And then I
9 started with going more into the property management
10 side.
11   Q  When did you become full time in property
12 management?
13   A  Probably 10 years ago.
14   Q  And tell me what you do in terms of a
15 day-to-day practice, particularly between 2003 and
16 2005 as a property manager.
17   A  Well, we have a list of properties that we
18 manage. Each property manager has a portfolio of
19 properties. And it is our job to run the daily, take
20 maintenance calls, arrange for repairs, obviously, try
21 to keep the buildings full.
22   Q  Now, with respect to the Bernstein property

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 9

1 or properties, we have sort of used the terms, the
2 house and the apartments to describe the two units, so
3 to speak, that are at the N Street address?
4   A  Right. It is actually a total of 10 units.
5   Q  10 apartments?
6   A  Well, the house is considered as part of the
7 certificate of occupancy. It is actually kind of in
8 the group. It is a 10-unit building, even though I
9 understand what you are saying about the house.
10   Q  So the 10 units would be the nine apartments
11 plus the house?
12   A  Correct.
13   Q  If you don't mind, I'll refer to it as the
14 house, that one unit, and then the apartments will be
15 the other nine rental apartments.
16   A  Okay.
17   Q  Do you have other properties where you have
18 the similar set-up, that is, the owners live in one of
19 the units you are managing and they have a rental
20 property right next door, essentially?
21   A  No.
22   Q  Is it an unusual situation, what the

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 10

1  Bernsteins have, in the property management field?
2      A  I'm sorry. Can you explain that?
3      Q  Is it unusual for a property manager to
4  manage the house that the owners are actually living
5  in?
6      A  Given that it's my only one, it is hard for
7  me to answer that. I guess it is unusual.
8      Q  And how did the Bernsteins get to the Fred A.
9  Smith Company? How did that relationship start?
10     A  That, I'm not sure. They were already with
11 the Fred A. Smith Company as far as I remember.
12     Q  Do you know who the property manager was
13 before you?
14     A  I believe it was Marty Mesmer.
15     Q  Is he still around?
16     A  Yes.
17     Q  Is he still with the Smith?
18     A  He is president.
19     Q  Was it you who brought Mr. Barclay who goes
20 by Murphy to the Bernsteins' house?
21     A  Well, mostly to the apartments.
22     Q  To the apartments?

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 11

1      A  To the whole property, yes.
2      Q  He had not worked for them before?
3      A  No.
4      Q  And what is your relationship in terms of the
5  Bernsteins? More specifically, how is that
6  documented? Do you have a standing contract with
7  them?
8      A  We have a management contract.
9      Q  I don't believe we asked you to bring
10 documents. Do you have that with you today?
11        MR. NOBLE:  You did ask.
12        MR. BROWN:  We did?
13        THE WITNESS:  You did ask me to bring that?
14 Then I apologize. Did it say bring documents?
15        MR. NOBLE:  Yes. The second page.
16        THE WITNESS:  I didn't do any of the
17 renovations. All records -- none of those pertain to
18 me.
19        BY MR. BROWN:
20     Q  Really, you are here by cooperative request.
21 So if we need those documents, we can figure a way to
22 get them.

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 12

1      A  It is a standard. Our contracts are all the
2  same. You are welcome. I can e-mail you one if you
3  want to see it.
4      Q  Great. Let me make a note to follow up with
5  this.
6         And are you still the Bernsteins' property
7  manager?
8      A  Yes.
9      Q  Do you have any responsibility for Winnifred?
10     A  Only that the Fred A. Smith does the payroll.
11     Q  Is she a Fred A. Smith employee or is she
12 hired directly by the Bernsteins?
13     A  She is hired directly by the Bernsteins. The
14 payroll shows Fred A. Smith.
15     Q  Is her pay through -- I'll just shorten it to
16 the Smith Company, if you don't mind?
17     A  Yes.
18     Q  Is her pay through the Smith Company?
19     A  Yes.
20     Q  Is that just an administrative convenience?
21     A  Yes.
22     Q  So her boss is Beverly Bernstein?

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 13

1      A  Yes.
2      Q  With respect to the Bernsteins' property, and
3  we'll look at the years 2003 to 2005, is there a --
4  let's talk about the house. Is there a daily or
5  weekly or a scheduled property management visit? Or
6  how is that handled in the nuts and bolts fashion?
7  How are the property issues handled?
8      A  Well, on specifically the house or the
9  apartments?
10     Q  On the house first.
11     A  Mrs. Bernstein would call me if she needs
12 anything.
13     Q  If she doesn't call, does anybody go to the
14 house?
15     A  Normally, no.
16     Q  And then on the apartments, how is it
17 handled?
18     A  Well, I do go by the properties. Probably
19 that building I go maybe once a week, once every
20 two weeks. I don't go into units unless tenants call.
21 I just more of a visual.
22        And if the tenants have a specific complaint,

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 26

1  this happened or didn't happen. But if Murphy is out
2  there working on a problem at the apartment and then,
3  for whatever reason, they have a switch that's not
4  working or a problem with the electrical wiring in the
5  house and they just say, hey, Murphy, can you look at
6  this?
7     A  Oh, that would be no problem at all.
8  Actually, there is a gentleman who works for Mrs.
9  Bernstein named Carl. And often times he can call.
10  He has all my vendor list. They have all the people.
11  They have the specific list for that for Mrs.
12  Bernstein.
13        In other words, they just don't go and choose
14  any plumber. There is a specific plumber and they
15  have an electrician. Murphy has been my electrician
16  for 15 years.
17     Q  But if Murphy does work, it's supposed to be
18  billed through you. Right?
19     A  Most -- 90 percent of the time, yes.
20     Q  What is the other 10 percent?
21     A  I guess if there were -- well, if there was
22  something personal like a lamp, an interior lamp that

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 27

1  wouldn't really be part -- I mean, I'm not saying I
2  wouldn't pay it if she asked me to pay it. But it
3  would have to go down in a different category.
4     Q  But if he changed an outlet --
5     A  That's building.
6     Q  -- or changed a switch --
7     A  That's building.
8     Q  -- or reconnected a dishwasher or an
9  appliance --
10     A  He wouldn't reconnect a dishwasher, because I
11  wouldn't think -- who would ask him to do that?
12     Q  But if he did that, should that have been
13  billed through you?
14     A  Yes.
15     Q  To your knowledge, has that occurred, that he
16  has done that when it wasn't billed through you?
17     A  No.
18     Q  And then back to the kitchen project. Were
19  you in the kitchen at any point when the appliances
20  were actually being hooked up?
21     A  No.
22     Q  Do you know who Mr. Scuderi or his company

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 28

1  is?
2     A  No.
3     Q  Do you know who Mr. Landis or Mr. Kerr or
4  their company is?
5     A  No.
6     Q  Mr. Kerr was the young man you may have seen
7  at the first Deposition when we were all here.
8     A  I did not. I thought he -- you mean the
9  gentleman sitting there? I thought he was an
10  attorney.
11     Q  No. The young guy who had a gold tie on who
12  was in your seat.
13     A  I thought he was an attorney.
14        MR. NOBLE: He looked like more of an
15  attorney than some of --
16        THE WITNESS: When I came here, I thought you
17  had not started. I thought I was the first one.
18        BY MR. BROWN:
19     Q  And I believe Mr. Kerr was here. But the
20  bottom line is you didn't recognize him as one of the
21  guys who was out there at the kitchen renovation
22  project with some frequency?

## BRADFORD ASSOCIATES
## CHRISTOPHER WALLIS

Page 29

1     A  No, I don't.
2     Q  Do you know who hooked up the dishwasher?
3     A  No.
4     Q  Do you know who hooked up any of the
5  appliances?
6     A  No.
7     Q  Were you involved in any way when the kitchen
8  project was finalized in checking to make sure that
9  things were working or installed properly or any of
10  those issues?
11     A  No.
12     Q  When there were changes to the property such
13  as this kitchen renovation, does part of your
14  obligation or does part of your practice involve
15  checking what was done?
16     A  No. Because I thought it was all done by
17  contractors. No. That was her choice. She chose --
18  she wanted to change. That was her choice.
19     Q  And my client, I may have told you earlier,
20  is Wuerstlin Appliance or Martin Wuerstlin. Do you
21  have any knowledge of their involvement?
22     A  No.

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 46

1    A   Murphy was down there for a whole day waiting
2  for PEPCO. So I was going home trying to get some
3  sleep. So he may have mentioned it. I can't recall.
4    Q   Did Sal, Sal Fiorito or Maggie Rubino,
5  Margaret Rubino come that night or that first day?
6    A   I think they went to see Mrs. Bernstein, I
7  think. As I say, I really was a little bit of a
8  blurred on who I was meeting. I was just calling
9  people all day there.
10   Q   Did you have any discussions with them that
11 first day?
12   A   Not that I recall.
13   Q   Have you ever discussed with them the fire?
14   A   Actually, no.
15   Q   Have you ever asked Sal Fiorito directly
16 whether he had anything to do with the hook-up of the
17 dishwasher?
18   A   No.
19   Q   Have you ever asked Maggie Rubino that?
20   A   No.
21   Q   Have you ever inquired anybody as to who
22 hooked up that dishwasher?

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 47

1    A   No.
2    Q   I'm sure I asked this, but you don't have any
3  information as to who did it. Correct?
4    A   No.
5        MR. NOBLE: You are referring to the
6  electrical hook-up?
7        BY MR. BROWN:
8    Q   Electrical hook-up, yes.
9    A   No.
10   Q   Is that how you understood my question?
11   A   Yes. I think in conversation they may have
12 said -- we talked about what happened, I think,
13 generally, about the fire department breaking all the
14 glass. But I don't remember anything specific other
15 than that.
16   Q   Do you have any more information about the
17 fire than what you have told us?
18   A   No. I still would like to know what
19 happened.
20   Q   Well, since those initial conversations, did
21 any people that you were around ever discuss either
22 with you or that you overheard in any more detail

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 48

1  discuss what happened about either the cause of the
2  fire, how the fire erupted, how it spread, anything
3  like that?
4    A   Well, I did, obviously, when the person came
5  down to look, as an investigator, this was a not a CSI
6  gentleman, but he was obviously -- I have forgotten
7  the name of what you call them, a forensic person,
8  came down and wanted to see it and then I think it was
9  taken away.
10       So I did hear that they thought the fire was
11 by either wiring or the dishwasher.
12   Q   Do you know if Mr. Shaw was his name? Does
13 that name Mike Shaw ring a bell?
14   A   Rings a bell.
15   Q   He was not with the D.C. fire department; he
16 was a private --
17   A   Private. And I probably have his card. I
18 kept -- I did actually on the fire thing I tried to
19 keep everyone's card. I was just collecting cards.
20   Q   So you might have that back at the office?
21   A   I might have that, yes.
22   Q   How much of the renovation work were you

BRADFORD ASSOCIATES
CHRISTOPHER WALLIS

Page 49

1  involved in?
2    A   None.
3    Q   Rollyns ultimately got the contract to do the
4  renovations?
5    A   Well, they took over. I don't know -- there
6  were lots of different people there, different
7  contractors. So I don't know the answer to that. I
8  think everything was going through Rollyns
9  Construction. I think -- I thought they were the
10 general contractor.
11   Q   That's my understanding.
12   A   Yes.
13   Q   Rollyn is R O L L Y N?
14   A   Yes. There is another one, I think, in
15 Maryland, Bethesda that has a different name. They
16 are out on Wilkins Avenue.
17   Q   But you weren't involved in their selection
18 or their performance as the contractor, whether as a
19 general or a subcontractor for the renovations?
20   A   No. I believe that was all dealing with the
21 3Gs and Rollyns. I had nothing to do with them.
22   Q   Do you have an understanding as to whether