BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

   (Civil Division)

FEDERAL INSURANCE

And HARTFORD CASUALTY INSURANCE

COMPANY,

     Plaintiffs    C.A. 1:06CV0379

   Vs.

LANDIS CONSTRUCTION CORPORATION

And WUERSTLIN APPLIANCE SERVICES,

   Defendants

----------------------------

    January 30th, 2008

    Millersville, Maryland

The DEPOSITION OF:

    MICHAEL E. SCHAAL, CFI

Taken at S.E.A. Limited, 1110 Benfield

Boulevard, Millersville, beginning at

10:00 a.m., before Chris Fox, Notary

Public in and for the State of Maryland,

when were present on behalf of the

respective parties

EXHIBIT
17

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 34

1  the dishwasher area towards the
2  refrigerator.
3       To the left side of the
4  dishwasher was the sink that had a
5  garbage disposal under it. All the
6  wiring under that looked fine. And the
7  damage that was under the kitchen sink
8  was consistent with the fire progressing
9  towards the kitchen sink from the area of
10 the dishwasher.
11      There were some charring to the
12 floor that was located beneath the
13 dishwasher.
14      So, all the patterns that I
15 looked at, and the indicators pointed
16 back to the origin of the fire being
17 where the dishwasher was located.
18   **Q. And with respect to the area of**
19 **origin, other than the area of the**
20 **dishwasher, were you able to make a more**
21 **detailed point of origin or smaller area**
22 **of origin, other than within what would**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 36

1  **dishwasher?**
2       A. The underside of the dishwasher.
3  It's the general area.
4    **Q. There's an area of burning**
5  **underneath the right front, if you broke**
6  **it into quadrants, I guess if we're**
7  **looking at it like it was -- you looked**
8  **at all these descriptions, you'd be**
9  **looking at it from, if it was still in**
10 **its position, and I'm walking up to it to**
11 **put a dish in it, okay?**
12      A. Correct.
13          MR. BROWN: Off the record.
14      (Discussion had off the record.)
15          MR. BROWN: Back on the record.
16 BY MR. BROWN:
17   **Q. So, if I'm looking at it from**
18 **that way, if we look at the right-front**
19 **quadrant, there's been some indication**
20 **that that's got an area of heavy burning?**
21      A. That's the area beneath the
22 dishwasher that had the heavier burning.

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 35

1  **be I guess the perimeter of the**
2  **dishwasher?**
3       A. It was beneath -- located beneath
4  the dishwasher.
5       There was some charring to that
6  floor, specifically towards the right
7  front corner of where the dishwasher was
8  located. The floor was charred in that
9  area.
10      So, it was pretty obvious that
11 the fire was in the motor compartment
12 area of the dishwasher.
13   **Q. Meaning what?**
14      A. Meaning that the fire was on the
15 underside of dishwasher, where the
16 electrical wiring and motor compartment
17 is located.
18   **Q. In terms of the motor**
19 **compartment, is that, in your mind, or**
20 **the way you're using those terms,**
21 **indicate a specific area or does that**
22 **just mean the underside of the**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 37

1  The floor was charred in that area.
2       If you wanted to divide the
3  dishwasher in quarters.
4    **Q. Right.**
5       A. Starting the left corner, the
6  left front corner with A, left rear
7  corner B, right rear corner C, and right
8  front corner D, it would be in the D
9  area, as in dog.
10   **Q. Okay. With respect to that area,**
11 **assuming that on occasion people will say**
12 **that the area of heaviest burning is also**
13 **likely the area of origin, there are also**
14 **reasons why an area of heaviest burning**
15 **may not be the area of origin, is that**
16 **correct?**
17      A. That's correct.
18   **Q. Okay. In this case, did you make**
19 **a determination whether that area, that**
20 **you described as D, was Number 1, the**
21 **area of heaviest burning and then, Number**
22 **2, whether or not there's enough**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 58

1  **Were you able to do it to that degree?**
2      A.  It was in the area of section D.
3          Was it directly on the floor?  I
4  don't think so.
5          There's nothing that would have
6  been directly on the floor, unless the
7  service wire was laying on the floor
8  there.
9          It's in that quadrant, whether
10  it's on the floor or an inch above the
11  floor, no.
12      **Q.  You can't tell?**
13      A.  No.
14      **Q.  Or two inches above the floor?**
15      A.  Correct.
16      **Q.  Okay.  You just know it was**
17  **somewhere below that stainless steel deck**
18  **and above the wood floor?**
19      A.  Correct.
20      **Q.  Okay.  All right.  And I**
21  **interrupted you.  What else did you do in**
22  **terms of your investigation into the**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 59

1  **cause and origin of this fire?**
2      A.  Finished photographing the site.
3  I collected the remains of the
4  dishwasher.  I looked at the refrigerator
5  and the power cord to the refrigerator.
6          I looked at the duplex outlet
7  that the refrigerator was plugged into,
8  which was located behind the
9  refrigerator, and was -- which was to the
10  right of the dishwasher.
11          I also looked at the compartment
12  beneath the sink.  The fire damage there
13  was consistent with fire exposure damage.
14          I looked at the -- no significant
15  damage to the dishwasher, Or any of the
16  electrical wiring that was located
17  beneath the sink.
18      **Q.  Okay.  And when you looked at**
19  **it -- you have some photos, do you recall**
20  **a kill switch or an on/off switch that**
21  **would have lead -- well, I'm sorry.**
22          **Would have connected the power**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 60

1  **from the circuit breaker to the**
2  **dishwasher?**
3      A.  There was a cutoff switch that
4  was between a -- mounted in a junction
5  box, a four-inch junction box, with a
6  on/off switch.  From that switch, the
7  wiring ran to the dishwasher.
8          I was able to determine that that
9  switch was a cutoff switch to cut power
10  off to the dishwasher, in the event I
11  guess if you had to service it.
12      **Q.  And when you photographed, I'm**
13  **looking at your I-9 and I-10, you have it**
14  **as being in the on position?**
15      A.  That's correct.
16      **Q.  Okay.  Did you ask whether or not**
17  **anybody had touched that in the three or**
18  **four days or five -- what was it?  In the**
19  **days between the fire and your**
20  **investigation?**
21      A.  I could tell that it was not
22  moved because of the way the smoke

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 61

1  patterns was on the switch itself.
2  That's why I took the photograph, to show
3  that it was on.
4          If the switch was off, you'd see
5  a protected area on the side of the
6  switch.
7          That wasn't there.  It clearly
8  indicated that that switch was on at the
9  time of the fire.
10      **Q.  Okay.  And just, is there**
11  **something in the photograph that**
12  **documents what you just said?**
13      A.  Well, yeah.  The fact that you
14  don't see any clear mark.  If you're
15  looking at the switch, photograph number
16  1-10, when you're looking at the side of
17  this switch, the smoke staining on it is
18  all consistent.
19          If it was in the other position,
20  you would see a protected area on the
21  side of the switch.  And it's not there.
22  Which indicates the switch was on at the

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 90

1      **Q. And so we're clear, what do you**
2  **mean prior to the fire? Do you mean for**
3  **days, months, years, what?**
4      A. Shortly before the fire. I want
5  to say it was within a half hour or an
6  hour.
7      **Q. And that came from Ms. Rubino?**
8      A. Yeah, from what I recall.
9      **Q. Okay. And then with respect to**
10 **prior issues or problems, what were**
11 **you -- what was the purpose of asking**
12 **those questions?**
13     A. Whether or not there's been any
14 -- I was advised that the dishwasher was
15 just recently installed, with a
16 remodeling of the kitchen. And that
17 whether or not there's been any repair
18 service to it since it's been installed.
19     **Q. And what did you find out with**
20 **respect to any problems or issues that**
21 **had happened post installation?**
22     A. That they did have an issue with

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 92

1      A. It was four months old, it's a
2  BOSCH. I got the serial number off the
3  unit, of course.
4      **Q. What does four months old refer**
5  **to? The service date?**
6      A. I believe it's for the
7  dishwasher. It was approximately four
8  months old.
9      **Q. Well, your report indicates it**
10 **was purchased in June of 2003. And I'm**
11 **not trying -- take a look at your report.**
12     A. Okay.
13     **Q. Be sure I'm reading this right.**
14     A. I would have got that off the
15 sales receipt. I have the sales receipt.
16     **Q. Okay. Well, you've got June 6,**
17 **2003. I'm not sure that's a dispute in**
18 **this case, as the date of purchase.**
19     A. Okay.
20     **Q. All right. So, is it your**
21 **understanding that the dishwasher was**
22 **four months old, or that the recent**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 91

1  the circulator pump, and that it was
2  repaired. And an initial repair man
3  came, he did not have the parts for that
4  repair.
5      And BOSCH subsequently sent one
6  of their service reps out, to repair the
7  dishwasher.
8      **Q. Okay. All right. Where is that**
9  **in your notes from Ms. Rubino?**
10     A. Where is what in my notes?
11     **Q. The history, so-to-speak, of the**
12 **dishwasher?**
13     **Is what is summarized on Page 4**
14 **of your report, top of Page 4 -- it**
15 **really starts on the bottom of Page 3,**
16 **but goes to top of Page 4, is this what**
17 **we're talking about?**
18     A. Yes.
19     **Q. Okay.**
20     A. I've got a note in my notes right
21 here. Says service.
22     **Q. Okay.**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 93

1  **service was about four months before?**
2      A. Could have been either/or. I'd
3  have to look at service dates of tickets.
4  She eventually faxed me some information.
5      **Q. Okay. But this is what she had**
6  **told you that day?**
7      A. Yeah. I mean that's what I got
8  written down. But I can't remember
9  whether or not I put serviced four months
10 old, whether it was the dishwasher four
11 months old, which doesn't appear to be
12 accurate, that it was serviced maybe
13 four months prior to.
14     **Q. And are you taking these notes**
15 **contemporaneously, basically, as she's**
16 **speaking?**
17     A. Yes.
18     **Q. Okay. It looks like these come**
19 **off a flip pad?**
20     A. Yes.
21     **Q. All right. And do you recall**
22 **what the problem that lead to the service**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 98

1  ever have any involvement with him?
2      A.  Not that I recall.
3      Q.  Okay.  All right.  And then this
4  last note, why don't you tell me what
5  that is.
6      A.  I've got written Mark Utke,
7  Bernstein case, it looks like Erie
8  insured the contractor.  August work,
9  Erie insured.  Lisa Stewart contractor.
10  Information, it looks like I probably got
11  from Mr. Utke.
12      And that then there was Charlie
13  Wade who was doing the cause and origin,
14  I guess, on behalf of Erie.  I don't
15  know.
16      Q.  Okay.  Do you know Charlie Wade?
17      A.  I remember the name, you know.
18  He might have -- he might have got
19  retained -- I really don't know who got
20  him there but obviously I got his name
21  here somewhere.  I can't recall.
22      Q.  Those notes apparently came from

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 99

1  either attorneys or the insurance
2  companies?  Those aren't site
3  investigation notes, those last two
4  pages?
5      A.  It looks like my notes.  I
6  probably had a conversation with
7  Mr. Utke.
8      Q.  That's fine.  All right.
9      MR. REGO:  Can you send down
10  Exhibit 4.
11      MR. BROWN:  Yeah, I'll send them
12  all down.  Exhibit 4 is only the three
13  pages.
14  BY MR. BROWN:
15      Q.  And I distracted you.  You said
16  you thought you might have got some
17  additional information from Ms. Rubino?
18      A.  Here is a fax that came, that I
19  believe, it actually -- yeah, Margaret
20  Rubino, it came from her.
21      Q.  Okay.  Did you find, or ask Ms.
22  Rubino about other problems with the

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 100

1  dishwasher?
2      A.  Yeah, I would have asked her if
3  there was any other problems.
4      Q.  Other than the one about not
5  drying properly, did she tell you about
6  anything others?
7      A.  Not that I recall.
8      Q.  Okay.  As you sit here today, do
9  you know whether there were other
10  problems with the dishwasher?
11      A.  No.
12      Q.  You don't know one way or the
13  other?
14      A.  No.
15      Q.  Okay.  That's correct, you don't
16  know one way or the other?
17      A.  That's correct.  I don't know one
18  way or the other.
19      Q.  I asked the question a bad way.
20  All right.
21      If you can, pull 1-7 photograph.
22      A.  (Witness complies.)

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 101

1      Q.  All right.  With respect to the
2  NM or Romex type cable coming out of the
3  switch box there, it appears -- and it
4  may just be the photograph, but it
5  appears to come out, and then it makes
6  sort of a sharp right angle and then
7  another sharp right angle.  Do you see?
8      A.  No.  You're going to have to show
9  me.
10      Q.  Okay.  And maybe I'm just looking
11  at it wrong because my copy is not maybe
12  as good as yours.
13      But it comes out and then it
14  seems to go bang, bang, okay.  It goes
15  down and then again, do you see that?
16      A.  No, I think actually what you're
17  looking at there, is it -- it goes
18  continues straight on.  This right here
19  is the rest of the Romex.  It comes down
20  and it goes straight on.
21      What you're looking at here, is
22  the remains of the water line.

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 130

1   a -- the second stage or a pre-burning
2   stage.
3       A time element is pretty hard.
4   My guesstimate, in this particular case,
5   the burn time from maybe start to finish
6   could have been anywhere between maybe a
7   half an hour to an hour.  Depending upon
8   how long it took the fire department to
9   get there and extinguish, fully
10  extinguish the fire.
11      **Q.  Okay.  Now, you talked -- you**
12  **talked pretty extensively about your**
13  **conversation with Margaret Rubino.  And**
14  **at any time in discussing any of the**
15  **aspects of this incident with her, did**
16  **you ever talk to her about any electrical**
17  **work that was initially done during the**
18  **renovation by any electrician?**
19      **Forget about just the dishwasher.**
20  **Just electrical work in general, did you**
21  **have any conversations with her about**
22  **that?**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 131

1       A.  No.  I didn't have any specific
2   conversations with her regarding the
3   electrical work.  It was general
4   conversation regarding the remodeling of
5   the kitchen and having a contractor, and
6   different subs.
7       Q.  You never even talked to her,
8   though, about the electrical work
9   regarding the dishwasher, did you?
10      A.  No.
11      **Q.  Okay.  And there was never a**
12  **discussion with anybody, during the**
13  **course of your investigation, about who**
14  **actually wired this dishwasher, during**
15  **that initial renovation work, back in**
16  **2003, was there?**
17      A.  No.
18      **Q.  Okay.  You don't have any**
19  **information that would indicate who did**
20  **that, do you?**
21      A.  No, no, I don't.
22      **Q.  Okay.  In looking at some of your**

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 132

1   **photos, and if you have them in front of**
2   **you, just flip to 1-7 to 1-10.**
3       **You have 1-7 and say 1-8 there in**
4   **front of you?**
5       A.  Yes.
6       **Q.  Okay.  When I look at these, I**
7   **see that red -- I guess that's a garbage**
8   **disposal, right?**
9       A.  Yes, it is.
10      **Q.  Okay.  That red item.**
11      **On the wall next to that, there's**
12  **a box, correct?**
13      A.  A junction box still mounted to
14  the wall.
15      **Q.  What is the purpose of that**
16  **junction box, if you know?**
17      A.  Well, a junction box is basically
18  a box to bring your service feed in, and
19  then branch out to different components.
20      I would suspect that that's the
21  junction box that ran the wiring for the
22  garbage disposal.

BRADFORD ASSOCIATES
MICHAEL E. SCHAAL, CFI

Page 133

1       **Q.  Garbage disposal.**
2       **Now, when you look at that**
3   **junction box, the one that's mounted on**
4   **the wall, okay, you see -- that's BX**
5   **cable going into the top of it, correct?**
6       A.  Correct.
7       **Q.  And is that BX cable coming out**
8   **of the bottom of that junction box?**
9       A.  Yes.
10      **Q.  And let me ask you this:**
11  **Anywhere, during the course of your**
12  **investigation, aside from the NM or Romex**
13  **cable that you've described that went**
14  **into the dishwasher, aside from that, did**
15  **you see any other Romex or NM cable in**
16  **this kitchen?**
17      A.  No.
18      **Q.  Okay.  Did you do any kind of**
19  **investigation as to any of the other**
20  **wiring in the house, aside from the exact**
21  **location, say where the fire was?**
22      A.  No.

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 150

1    **Q. Yeah. But I need you to do this,**
2    **the turning of the photographs, so it's**
3    **clear when I read this a year from now,**
4    **what we're talking about. I mean you can**
5    **see I think the -- the round hole, I**
6    **guess?**
7       A. Well, if you -- if we go to the
8    top portion here, where you've got your
9    holes --
10   **Q. Um-hmm.**
11      A. -- I believe that's the way we
12   oriented it before.
13   **Q. Right.**
14      A. Okay. The box would be mounted
15   right here, the lower portion of the
16   panel.
17   **Q. On the flip side?**
18      A. So, it would have been right
19   here. And I'm going to put a B for box.
20   **Q. Now, which edge of that diagram**
21   **is against the wall, just so we're**
22   **crystal clear?**

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 152

1    **Q. Okay. And with respect to the**
2    **wire that you saw, the NM wire, were you**
3    **able to determine whether it was or**
4    **wasn't run through those clamps?**
5       A. I couldn't determine that, no.
6    It was already removed from there.
7    **Q. Okay. But looking at the wire,**
8    **which I think is probably best**
9    **exemplified in if we look at photograph**
10   **1-7, do you see any protection marks that**
11   **correlated with those clamps?**
12      **You would expect protection**
13   **marks, correct?**
14      A. Well, I can't see it in this
15   photograph, no way.
16   **Q. Okay. Well, when I asked you, I**
17   **didn't let you answer the first question.**
18   **That was my mistake.**
19      **Well, you would have expected**
20   **protection marks from the clamps, if that**
21   **wire had been run through the clamps at**
22   **the time of the fire, correct?**

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 151

1       A. This B box would have been
2    underneath the sink, on the side panel.
3    **Q. Right. And then just -- would**
4    **this be the front and this be the back?**
5       A. Yes.
6    **Q. Okay. Why don't write wall edge**
7    **here.**
8       A. (Witness complies.)
9    **Q. Great. All right.**
10      **And then you said you saw these**
11   **two bracketing devices. Do you believe**
12   **the Romex was run through the -- or NM**
13   **was run through these bracketing devices?**
14      A. They are clamps that could hold
15   either NM wiring or BX wiring.
16   **Q. Okay. And I think those are**
17   **pretty self-evident, where you're talking**
18   **about on I-43 upper right -- I'm sorry,**
19   **upper right and sort of upper center in**
20   **the photograph, those two little silver**
21   **things?**
22      A. Correct.

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 153

1       A. Potentially you could, yes.
2    **Q. Okay. Did you look for that?**
3       A. No.
4    **Q. All right. Would that still be**
5    **visible today, if we look at that wire?**
6       A. It very well may be, yes.
7    **Q. Okay. Well, if we had**
8    **photographs of that wire, taken more**
9    **close to the fire, it would be visible in**
10   **those photographs, I would take it?**
11      A. Yeah, if you had some close-up
12   photographs taken of the entire length of
13   the wire, you might be able to tell, yes.
14   **Q. Okay. You don't have any, do**
15   **you?**
16      A. I don't have any what?
17   **Q. Close-up photographs that would**
18   **show that length of the wire?**
19      A. No.
20   **Q. Okay. And then with respect to**
21   **those questions, you were asked about --**
22   **for the record, we modified Exhibit 2 for**

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 154

1  those purposes, correct?
2      A. Yes.
3      Q. Okay. And with respect to NFPA
4  921 questions you were asked, part of
5  that protocol is to make sure you
6  accurately document the information
7  you're being told at the scene, and you
8  include in your report?
9      A. It's to conduct a systematic
10 approach to investigating a fire scene.
11     Q. Sure.
12         But it's accurate note taking and
13 record keeping and report writing also a
14 fundamental tenet of NFPA 921?
15     A. Yes.
16     MR. UTKE: Objection to the form.
17 BY MR. BROWN:
18     Q. As well as your approach to any
19 fire investigation?
20     A. Yes.
21     Q. You do more than one fire a year,
22 I take it?

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 156

1      Q. Okay. And what -- do you know
2  what the suppression time would be?
3      A. I'd have to look at their report
4  to see what their in-service time. And
5  they wouldn't document that.
6         You know, you'd arrive on
7  location, you'd get the alarm time, you'd
8  arrive on location. And then you'd -- in
9  this particular case, they probably
10 weren't even given an under control time.
11         But an under control time doesn't
12 indicate the fire is suppressed, so the
13 only other indicator would be the time
14 that the fire department went in service.
15     Q. Okay.
16     A. So, you'd know the time they were
17 called and the time they went in service.
18 So that's a timeframe.
19     Q. Okay.
20     A. What you can't accurately depict
21 is when the actual ignition occur, to the
22 discovery of the fire.

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 155

1      A. Yes.
2      Q. Okay. So, is it important for
3  you to have accurate notes and make your
4  report accurate, so that years later,
5  when you're being deposed, you can say
6  with a high degree of confidence this is
7  what I said, this is what I was told, the
8  report means what it says?
9      A. Yes.
10     Q. Thank you -- oh, one last
11 question.
12         You indicated a half hour to an
13 hour was your best estimate in terms of
14 the -- the ignition to suppression
15 scenario, I think, but I wanted to make
16 sure.
17         Was that ignition to -- was that
18 first fire event to suppression, or first
19 fire event to alarm?
20     A. First fire event to suppression.
21     Q. To final action?
22     A. Right.

## BRADFORD ASSOCIATES
## MICHAEL E. SCHAAL, CFI

Page 157

1      Q. Okay. And I just wanted to make
2  sure I understood your parameters of
3  that. Okay. That's all I have.
4      MR. UTKE: No.
5      MR. REGO: I'm done.
6      MR. TETRO: Get out while you
7  can.
8  BY MR. BROWN:
9      Q. Yeah. If we -- I don't think
10 it's likely, but if we needed to have
11 that stuff brought here for Mr. Neary's
12 deposition, are you in your office today?
13     A. It depends on how many calls I
14 get as soon as I turn my phone back on.
15     Q. Right now, you're going out to a
16 site, I take it?
17     A. That's correct.
18     Q. Or you wouldn't have tolerated
19 all these questions -- this is off the
20 record. Oh, were you typing it? You can
21 keep it on the record.
22         So, if it seems that it's