**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(Civil Division)**

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY** | : | |
| **and** | : | |
| **HARTFORD CASUALTY** | : | **CASE NO.: 1:06CV00379** |
| **INSURANCE COMPANY,** | : | |
| | : | **MAGISTRATE JUDGE: ALAN KAY** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANDIS CONSTRUCTION** | : | |
| **CORPORATION** | : | |
| **and** | : | |
| **WUERSTLIN APPLIANCE** | : | |
| **SERVICE** | : | |
| **and** | : | |
| **PAUL A. SCUDERI, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS, PAUL A. SCUDERI, INC. AND WUERSTLIN
APPLIANCE SERVICE'S MOTION FOR SUMMARY JUDGMENT**

I.    INTRODUCTION

Plaintiffs' lawsuit arises from a fire that occurred in the home of Beverly Bernstein on

May 9, 2005.  Mrs. Bernstein's home is located at 3248 N. Street, N.W., Washington, DC,

20007.  At the time of the fire, Mrs. Bernstein's home was insured by Plaintiff, Hartford

Casualty Insurance Company ("Hartford"), and her contents were insured by Plaintiff, Federal

Insurance Company ("Federal").

In their lawsuit, Plaintiffs assert subrogation claims against Defendants, Landis

Construction Corporation ("Landis"), Wuerstlin Appliance Service ("Wuerstlin"), and Paul A.

Scuderi, Inc. ("Scuderi").  As alleged in Plaintiffs' Complaint, and confirmed during the

discovery stage of this litigation, Landis was the general contractor retained by Bernstein to

provide for and supervise the construction activities involved in refurbishing the kitchen to her

residence; the kitchen project began sometime in May, 2003 and was completed sometime in

October of that year.  Scuderi, a licensed electrical contractor, was the only electrician hired to

perform (and responsible for) electrical services pursuant to the renovation project, which

included establishing the electrical connection between the wiring to a Bosch dishwasher and the

branch-circuit wiring to Bernstein's home.  Wuerstlin, an appliance service and repair company

authorized to service dishwashers under Bosch's warranty, performed service and repair work to

Bernstein's dishwasher in August 2004, which included replacing the circulator pump to the

dishwasher.

As stated in Defendants' Motion, it is not disputed that the May 9, 2005 fire loss

occurred, and originated at the dishwasher.   As Defendants also concede, however, the exact

cause of the fire is in dispute, and is sufficient reason alone to deny Defendants' Motion.

As discussed *infra,* based upon the results of the substantial written discovery and

depositions which have been completed in this case, Plaintiffs have produced sufficient evidence

to demonstrate that Defendants' negligence contributed to and/or caused the fire.  Specifically,

Plaintiffs have produced sufficient evidence to demonstrate that the fire was caused by Scuderi's

negligence in improperly connecting the subject dishwasher at the time of its installation

sometime in late 2003.  Scuderi was not only the sole licensed electrician hired to perform any

electrical work for the renovation project, but also not only charged, but was compensated by

Bernstein for making the electrical connection at issue.  Plaintiffs also produced sufficient

evidence to show that Wuerstlin's negligence in performing service work to the subject

dishwasher in August 2004 also contributed to and/or caused the fire since Wuerstlin was not

only the last party to have any involvement with the dishwasher prior to the fire loss, but also

was required to disconnect the electrical connection between the dishwasher power wiring and

the branch-circuit wiring (to perform its service work), and therefore created and/or perpetuated

the improper connection in reconnecting the dishwasher power wiring to the branch-circuit

wiring after completing its service work.  Consequently, Defendants' Motion for Summary

Judgment must be denied.

II.    PLAINTIFFS' RESPONSE TO DEFENDANT, PAUL A. SCUDERI, INC.'S
       STATEMENT OF MATERIAL FACTS TO WHICH THERE IS A GENUINE
       DISPUTE [1]

       1.    Admitted.

       2.    Admitted.

       3.    Admitted.

       4.    Admitted.

       5.    Admitted.

       6.    Admitted.

       7.    Admitted.

       8.    Admitted.

       9.    Admitted.

       10.   Admitted.

       11.   Admitted.

       12.   Admitted.

---

[1] According to LCvR 56.1, the facts identified by the moving party in its Statement of Material Facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the Motion.  Defendants' Statement of Material Facts is set forth in narrative form, rather than in itemized numbered paragraphs.  Therefore, to avoid inadvertently admitting any facts set forth in Defendants' Statement of Material Facts, Plaintiffs respond to each sentence set forth in Defendants' Statement as if each sentence were its own numbered paragraph.  As a result, Plaintiffs' Response to Defendants' Statement of Material Facts aims solely to either admit or deny the facts set forth in numbers 1-80 of Defendant, Scuderi's Statement (and numbers 1 through 10 of Wuerstlin's Statement).  To the extent necessary, Plaintiffs also set forth an additional Statement of Material Facts which consists of facts not previously addressed or raised by Defendants' Statement of Material Facts, but still germane to the issues raised in this case.

13.     Admitted in part; denied part.  As discussed *infra,* Plaintiffs concede there is no disclosed written document -- other than Estimate No. 348 -- which verifies any electrical work done by Scuderi and therefore the Estimate sets forth the *entire* scope of work performed by Scuderi at Bernstein's residence. (Exhibit "1", Estimate No. 348).

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Denied.  Since ROMEX wiring was found connected to the dishwasher power wiring at the scene after the fire occurred, Plaintiffs dispute that Scuderi ever left a "BX" cable connection to the dishwasher.  (Exhibit "2", Deposition of Michael Schaal, CFI,  69).

18.     Denied.  Plaintiffs dispute that Scuderi left "BX" wire to connect to the dishwasher.  (*Id.*)

19.     Admitted.

20.     Admitted.

21.     Denied.  Scuderi concedes that he was "contracted to make a final connection, electrical connection, on the dishwasher."  (Exhibit "3", Deposition of Paul Scuderi, 27). Further, Scuderi concedes that the language used in Estimate No. 348 (which his company prepared) -- "Rewire DW in existing location" --  addresses making the electrical connection between the dishwasher power wiring and the house circuit wiring at issue in this case.  (*Id.* at 28).  Finally, Scuderi was also compensated for performing all work on the Estimate which included his charge for rewiring the dishwasher.  (*Id.* at 45).

22.     Denied.  (*See Id.*)

23.     Admitted in part; denied in part. (See Plaintiffs' Response to Defendant's Statement of Material Fact No. 17.)

24.     Admitted in part; denied in part.  It is admitted that Scuderi purchased "BX" wire based on his invoices and materials purchased for the Bernstein renovation.  However, it is denied that "BX" wire was actually used to make the electrical connection. (Exhibit "2", 69).

25.     Admitted.

26.     Admitted.

27.     Denied.  (*See* Plaintiffs' Response to Defendant's Statement of Material Fact No. 13).

28.     Admitted.

29.     Admitted in part; denied in part.  The Statement of Material Fact is admitted, except only to the extent that it sets forth that Scuderi did not make the electrical connection at issue, which is denied.  (See Plaintiffs' Response to Defendant's Statement of Material Fact No. 21.)

30.     Admitted.

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.    Admitted.

40.    Admitted.

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Admitted.

45.    Admitted.

46.    Admitted.

47.    Admitted.

48.    Admitted.

49.    Admitted in part; denied in part.  It is admitted that Mrs. Rubino has no personal knowledge of who provided the electrical connection to the dishwasher at issue.  However, Rubino testified that either Scuderi or Landis had to have made the connection, based upon her role as one of Bernstein's consultants for the renovation project.  (Exhibit "4", Deposition of Margaret Rubino, 104).

50.    Admitted.

51.    Admitted.

52.    Admitted.

53.    Admitted.

54.    Admitted.

55.    Admitted.

56.    Admitted.

57.    Admitted.

58.    Admitted.

59.    Admitted in part; denied in part.  It is admitted that Mr. Barclay is the insured's master electrician, but to the extent that he performed electrical work to Bernstein's rental units only; it is denied that Barclay ever performed electrical work to Bernstein's residence, specifically with regard to the kitchen renovation project.  (Exhibit "5", Deposition of Chris Wallace, 27).

60.    Admitted.

61.    Admitted.

62.    Admitted.

63.    Admitted.

64.    Admitted.

65.    Admitted.

66.    Admitted.

67.    Admitted.

68.    Admitted.

69.    Admitted.

70.    Admitted.

71.    Admitted in part; denied in part.  Schaal's testimony with regard to the origin is admitted; however, with regard to Scuderi's footnote 3, it is denied that the cause of the fire at issue was due to a manufacturing defect in the Bosch dishwasher, since Plaintiffs' experts have ruled out any sort of manufacturing defect as having any involvement in causing the fire. (Exhibit "6", Deposition of Robert Neary, P.E., 107-108).

72.    Admitted.

73.     Admitted.

74.     Admitted.

75.     Admitted.

76.     Admitted.

77.     Admitted in part; denied in part.  It is admitted that Neary cannot confirm whether

the evidence of arcing at the end of the ROMEX wiring *that connected to the junction box to*

*Bernstein's home* was evidence either of a cause or casualty of the fire.  However, it is denied

that this section of the ROMEX wiring is relevant to Plaintiffs' theory of liability.  More

specifically, Neary addressed this issue during his deposition when he clarified for the record

that he believed during his initial investigation that the end of the ROMEX wiring referenced by

defense counsel on pages 236-237 of Neary's deposition *was* the connection to the dishwasher at

the time that he prepared his report. (Exhibit "6", 292-293).  However, during his deposition,

Neary clarified his later understanding (*which he learned after he completed his report*) that the

reverse end of the ROMEX wiring referenced by defense counsel *is* the end of the wiring that

was connected to the dishwasher.  (*Id.*)  Defense counsel never asked Neary to testify about

whether the reverse end of this ROMEX wiring at issue had any evidence of arcing or beading,

and whether such arcing was evidence that the wiring was the cause or a casualty of the fire.  (*Id.*

at 293; *See generally* Exhibit "6").  Had he done so, Neary would have testified that this

evidence of arcing is evidence of a cause  -  not a casualty -- of the fire.  *See generally* Exhibit

"8", expert report prepared by Neary.[2]

78.     Denied.  (*Id.*)

_____

[2] Plaintiffs' mechanical engineering expert, Ken McLauchlan, noted the presence of arcing on the relevant end of the
ROMEX wiring at issue, because defense counsel asked him the appropriate questions *for this particular section of
the wiring*.  See Plaintiffs' Statement of Material Facts No. 17.

79.    Admitted in part; denied in part.  It is admitted that Neary was not asked to attribute the conduct of any particular Defendant to the cause of the fire since that was not part of his assignment as Plaintiffs' electrical engineering expert; it is denied that Neary is incapable of doing so based upon the information available to him in the case.  (*Id.* at 210-211).

80.    Denied.  *See generally* Plaintiffs' Response to Defendant, Scuderi's Statement of Material Facts.

III.    PLAINTIFFS' RESPONSE TO DEFENDANT, WUERSTLIN APPLIANCE SERVICE'S ADDITIONAL STATEMENT OF MATERIAL FACTS FOR WHICH THERE IS A GENERAL DISPUTE

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted in part; denied in part.  It is admitted except to the extent that this Statement of Fact implies that Smith did not actually disconnect the electrical connection points between the house electrical supply line and the internal wiring feeds for the dishwasher. Specifically, Smith testified that he would "typically" disconnect the electrical power to the dishwasher because the connection is not long enough to not disconnect the electrical power line in order to complete service work to the dishwasher.  (Exhibit "9", Deposition of Tom Smith, 116-117).

5.    Denied.  Wuerstlin completed the warranty work for the dishwasher on or about August 11, 2004.  (Exhibit "9", 134).  The dishwasher junction box is made of steel.  (Exhibit "7", 124).  The temperature of the fire would not be high enough to destroy a steel junction box. (*Id.*)  The remains of the dishwasher junction box were never recovered from the fire scene. (Exhibit "6", 261).  A junction box was provided with the dishwasher based upon the

-9-

instructions that came with that dishwasher. (Exhibit "7", 188-189). Therefore, there was no

junction box at the time that Wuerstlin performed their service work. ("Exhibit 7", 240-241)

> 6.    Denied. Mike Schaal's testimony in this regard is as follows:

> "Q.    Alright. So, is it your understanding that the dishwasher
> was four months old, or that the recent service was about four
> months before?

> A.    Could have been either/or. I'd have to look at service dates
> of tickets. She [Rubino] eventually faxed me some information.

> Q.    Okay. But this is what she [Rubino] had told you that day?

> A.    Yeah. I mean that's what I got written down. *But I can't
> remember whether or not I put serviced four months old, whether
> it was the dishwasher four months old* which doesn't appear to be
> accurate, that it was serviced maybe four months prior to.

(Exhibit "2", 92-93) (Emphasis supplied)). Schaal's testimony specifically states that he cannot

remember the significance of the reference to four months in his notes, and Defendant's efforts

to imply meaning when there is none should therefore be discounted.

> 7.    Denied. (*See Id.*)

> 8.    Admitted.

> 9.    Denied. Schaal specifically testified that the presence of "fish tape" occurred

from the time of the installation or when subsequent work was performed, which includes the

work performed by Wuerstlin. (Exhibit "2", 75-76).

> 10.    Denied. There has been no evidence to suggest that there was any service work

provided by anyone subsequent to the work performed by Wuerstlin. (See Plaintiffs' Response

to Defendant, Wuerstlin's Statement of Material Fact No. 6).

IV.    PLAINTIFFS' STATEMENT OF MATERIAL FACTS TO WHICH THERE IS
       NO GENUINE DISPUTE

1.      The fire originated in the right front corner of the dishwasher because that was the area of heaviest burning.  (Exhibit "2", 38-39).

2.      The cause of the fire is "some heating of the electric wiring, which caused some short or failure, that caused ignition of some combustible material in the dishwasher." (*See generally,* Exhibit "8"; Exhibit "6", 211).

3.      The purpose of the dishwasher junction box is to bring the branch-circuit house wiring connection into the dishwasher; it is designed to protect the electrical connection from physical damage. (Exhibit "6", 266).

4.      The junction box would contain the movement of wires inside the junction box so that the wires would not be moving back and forth; however, if they are suspended in free air, they could be bouncing up and down.  (*Id.* at 277).

5.      The dishwasher junction box is made of steel. (Exhibit "7", 124).

6.      The temperature of the fire would not be hot enough to destroy a steel junction box (*Id.*); and it was never recovered from the fire.  (Exhibit "6", 261).

7.      A strain relief is required by the dishwasher instructions to ensure a proper connection between the dishwasher power wiring and the electrical supply line.  (Exhibit "7", 194).

8.      The strain relief fitting is also made of steel.  (*Id.*)

9.      The strain relief should be supplied by the installer.  (*Id.*)

10.     There was no evidence of the strain relief after examining the remains of the fire debris.  (*Id.* at 193-194).

11.     The absence of a strain relief played a role in this fire because a strain relief provides protection against movement of the wire nut connections.  (*Id.* at 195).

-11-

12.     The wires on the connection point were not secured within the dishwasher junction box, so with the conductors not moving, and the dishwasher moving, one would transmit vibrations to the wire nut connections.  (*Id.* at 218).

13.     A miniscule amount of vibration over time could be damaging and could cause a loosening of components.  (*Id.* at 219).

14.     There is physical evidence that the ignition source of the fire was resistance heating, based in part upon an improperly installed wire nut connection.  (*Id.* at 226-227).

15.     There was no evidence of markings on the remains of the conductors to the electrical supply line to show that a wire nut had been properly attached.  (*Id.* at 142).

16.     There was evidence of electrical activity on one of the two conductors of the electrical supply line which is consistent with an improper wire nut connection, and is evidence of an improper dishwasher electrical connection.  (*Id.* at 138).

17.     There was evidence of electrical activity on the tips of one of the conductors that did not have a wire nut attached to it running form the house power line to the dishwasher; this electrical activity was *not* a casualty of the fire.  (*Id.* at 61-62).

18.     The first item to burn was the electrical wire cable insulation of the electrical wiring based upon where the fire originated.  (*Id.* at 223-224).

19.     This condition was created by the improper installation of the dishwasher electrical connection that led to the fire.  (*Id.* at 126).

20.     The dishwasher electrical connection was improperly done because the installation instructions require a junction box and strain relief [3] to be used.  (*Id.* at 230-231).

---

[3] The strain relief has been alternatively referred to as a ROMEX connector, which refers to the same device used to secure the wiring within the dishwasher junction box at the connection point between the dishwasher power line and the house electrical supply line.

21.     The evidence of electrical activity at the end of the wire conductor that connects to the dishwasher wiring at the point where the fire originated, and the absence of a strain relief or junction box from the fire debris provide evidence of Defendants' negligence in causing this loss.  (*Id.* at 131; 230-231).

22.     The initial installer of the dishwasher had to have made the improper connection because the dishwasher does not run if there is no power supplied to it.  (*Id.* at 233, 235).

23.     A proper connection is required under the National Electrical Code to prevent strain from being transmitted to the unsecured wires.  (*Id.* at 241).

24.     Scuderi is the electrician of record and is therefore responsible for all electrical work performed, unless he notifies parties that he did not do the work and will not be responsible, since he was the licensed electrician who pulled permits for the renovation project. (Exhibit "6", 319-321; 339).

25.     Scuderi's specification on his invoice to Bernstein that he is rewiring the dishwasher means that he also in fact made the connection.  (*Id.* at 338-339).

26.     According to the dishwasher instruction manual, disconnecting the electrical connection between the dishwasher and the electrical supply line is required to replace a circulator pump.  (*Id.* at 307).

27.     The servicer of the dishwasher should have noted the absence of a junction box on his service ticket or have said something to the owner.  (*Id.* at 311).

28.     The remains of the capacitor to the dishwasher showed evidence of it only being a victim of the fire.  (Exhibit "7", 169, 176).

29.     If there was an explosion in the capacitor, i.e., if the capacitor was involved in causing the fire, there would be a hole; the capacitor did not explode because there is no evidence of a hole and it was subject to external heating and therefore melted.  (*Id.* at 177).

30.     Scuderi hardwired the dishwasher since he was the only electrician on the project. (Exhibit "10", Deposition of Sal Fiorito, 41).

31.     Scuderi handled all of the electrical work because he was contracted to do the electrical work; no other electricians were involved in the kitchen renovation project.  (Exhibit "11", Deposition of Andrew Kerr, 23).

32.     Kerr had an understanding that the electrician was going to connect the electric power to the dishwasher.  (*Id.* at 31-32).

33.     Kerr testified that it was "highly likely" that he made a telephone call to Scuderi to notify him that all appliances, including the dishwasher, were ready to be hooked up.  (*Id.* at 41).

34.     Scuderi pulled all electrical permits for the project.  (Exhibit "3", 59).

35.     If Scuderi did not perform the electrical connection, the dishwasher would not work.  (Exhibit "11", 48).

36.     Scuderi testified that it was "customary" that appliances can be installed and wired by someone else working on the job.  (Exhibit "3", 46-47).

37.     Kerr testified that it was improper for Scuderi to leave the task of hardwiring the dishwasher connection for someone other than himself to complete.  (Exhibit "11" at 48).

38.     At the *minimum,* one would need at least twenty-nine inches (the width of the countertop to the dishwasher) for the dishwasher to come clear of the countertop to facilitate the service work  (Exhibit "9", 84).

-14-

39.    It took Smith roughly forty minutes to complete his complete service job at the Bernstein residence on August 11, 2004.  (*Id.* at 109).

40.    Smith performed the service call by himself; no one supervised his work.  (*Id.* at 114).

41.    Smith testified that he would "typically" disconnect the electrical power to the dishwasher because there is "typically" insufficient slack in the electrical supply line to enable himself to service the dishwasher without disconnecting the electrical power line.  (*Id.* at 116-117).

42.    The electrical connections would *have* to be disconnected in order to take the strain relief off of the power line.  (*Id.* at 140).

V.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE PLAINTIFFS HAVE SET FORTH SUFFICIENT EVIDENCE TO DEMONSTRATE THAT THERE IS A GENUINE DISPUTE OF MATERIAL FACT CONCERNING WHETHER DEFENDANTS' INSTALLATION AND/OR SERVICING OF THE DISHWASHER IN QUESTION CAUSED THE FIRE AND ENSUING DAMAGES TO BEVERLY BERNSTEIN'S PROPERTY

A.    APPLICABLE STANDARD

Summary judgment is only appropriate when a review of the record reveals that there exists no genuine dispute of material fact so that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To defeat a Summary Judgment Motion, the non-moving party has the burden of proving beyond the pleadings that there are factual disputes at issue in the case which are both material and genuine.  Fed. R. Civ. P. 56(e).  The non-moving party must create a genuine issue of fact supported by admissible evidence sufficient for a reasonable finder of fact to find in favor of the non-moving party.  Hinton v. Stein, 278 F. Supp. 2d, 27, 32 (D.D.C. 2003).  As discussed *infra,* Plaintiffs have put forth sufficient evidence that there is a genuine dispute of material fact as to the issues involved in this case.

B.    PLAINTIFFS' EXPERT WITNESSES HAVE SET FORTH SUFFICIENT
EVIDENCE TO DEMONSTRATE THAT THERE IS A GENUINE ISSUE OF
MATERIAL FACT AS TO WHETHER AN IMPROPER ELECTRICAL
<u>CONNECTION TO THE DISHWASHER IN QUESTION CAUSED THE FIRE</u>

Plaintiffs retained Robert A. Neary, P.E., their electrical engineering expert, and Kenneth

R. McLauchlan, P.E., CFEI, their mechanical engineering expert, as their expert witnesses to

investigate the cause of this fire loss.  Both witnesses have submitted expert reports as part of

Plaintiffs' Expert Witness Designation, and both witnesses have been deposed.

After examining the remains of the dishwasher, Neary concluded that the electrical

branch-circuit for the dishwasher was installed improperly.  The junction box provided with the

dishwasher for splicing the incoming branch-circuit wiring to the conductors for the dishwasher

was not used.  There was also no wire connector provided for strain relief for the connection

point of the branch circuit wiring to the dishwasher power wiring.  The absence of either a

junction box or a strain relief made the wiring subject to the vibrations of the dishwasher's

operation, which over time loosened the electrical connections, resulting in the heating of the

connection.

Neary observed a small amount of arcing on the phase conductor branch-circuit wiring

and concluded that this evidence of arcing was the result of a loose connection between the phase

conductor and the wire provided for the dishwasher's power supply.  The wiring connection

between the branch-circuit wiring and the dishwasher power supply wiring was therefore not

properly installed.  Neary concluded that the vibration of the dishwasher loosened the connection

between the phase conductor to the branch-circuit wiring and the dishwasher's power wiring,

resulting in a high resistance connection that was a heat source for the fire.  This arcing in the

wiring eventually caused ignition of combustible material in the dishwasher, triggering the fire.

PHLDMS1 4306860v.1

McLauchlan also reached the same conclusions. Specifically, McLauchlan concluded that the dishwasher was installed improperly. The dishwasher was installed without a properly installed strain relief in the power supply junction box. This failure allowed force to be transmitted to the wire nut connections, causing the wiring connection to increase in electrical resistance. The dishwasher was installed in a manner that was contrary to the manufacturer's installation instructions, because neither a strain relief nor a junction box was used to secure the electrical connections between the dishwasher power wiring and the branch-circuit house wiring. McLauchlan also concluded that the ignition source for the fire was resistance heating at the improperly installed wire nut connection between the branch circuit conductors and the internal power wiring of the dishwasher.

Based on the above, Plaintiffs have set forth sufficient evidence to support their expert witnesses' opinion that the electrical connection at issue was improper and how this negligent electrical connection caused the fire. Defendants' experts argue, however, that either a defective capacitor (in the opinion of Dale Benedick, Wuerstlin's electrical engineering expert witness) or a defective starter (in the opinion of Terrence DuVall, Scuderi's electrical engineering expert witness) was the cause of the fire. As discussed *supra*, Plaintiffs' expert witnesses disagree with the findings of Defendants' expert witnesses on the issue of what caused the fire.[4] The differences in opinion as to the cause of the fire among the parties' expert witnesses thus underscore how there is a genuine issue of material fact as to what triggered the fire.

Defendant, Scuderi's argument that Plaintiffs are unable to meet their burden of proof as to the cause of the fire because Neary is allegedly unable to render an opinion as to the cause of the fire is misplaced and erroneous. Scuderi argues that Neary "was unable to testify whether the

---

[4] For example, McLauchlan ruled out the dishwasher capacitor as not being involved in causing the fire. There was no evidence of a hole in the remains of the capacitor which is a necessary predicate to finding that an explosion occurred in the capacitor, triggering the fire. (*See* Plaintiffs' Statement of Material Facts No. 32).

evidence of the arcing the [sic] he claims to have observed on these wires to the dishwasher was a cause, or instead, a victim of the fire." Scuderi further states that Neary is "unable to render an opinion, more probably than not, that this alleged evidence of arcing present on the wire happened before the fire, thus allegedly causing it, or after the fire, thus caused by it." Scuderi, however, misinterprets Neary's testimony on this issue since it concerns a portion of wiring that is not at the precise location where the fire started.

The wiring referenced by defense counsel on pages 236 and 237 of Neary's deposition refers to the evidence of arcing at the end of the ROMEX wiring *that connects the junction box to Bernstein's home*, not the end of the ROMEX wiring that connected to the dishwasher. Neary addressed this issue during his deposition when he clarified for the record that he believed during his initial investigation that the ROMEX wiring referenced by defense counsel during Neary's deposition (and depicted in photograph #6 of Neary's expert report, Exhibit "8") *was* the wiring connection to the dishwasher *at the time* he prepared his report. However, at a later point during his deposition, Neary clarified his later understanding (i.e., after he prepared his report) that the reverse end of the ROMEX wiring referenced by defense counsel *is* the end of the wiring that was connected to the dishwasher. For reasons unknown, defense counsel never asked Neary to testify about whether the reverse end of this ROMEX wiring at issue had any evidence of arcing or beading, or whether such arcing was evidence that the wiring was the cause or a casualty of the fire. Had he done so, Neary would have testified that this evidence of arcing is evidence of a cause - not a casualty - of the fire. (*See In re Ephedra Products Liability Litigation*, 478 F. Supp. 2d 624, 634 (S.D.N.Y. 2007) (stating that expert witness opinion is limited to what is either actually disclosed in his deposition or *likely would have been disclosed in answer to an appropriate question*) (emphasis supplied) (*See also* Footnote 2).

C.    PLAINTIFFS HAVE SET FORTH SUFFICIENT EVIDENCE OF A GENUINE
ISSUE OF MATERIAL FACT THAT SCUDERI MADE THE IMPROPER
ELECTRICAL CONNECTION TO THE DISHWASHER BECAUSE HE NOT
ONLY WAS THE SOLE ELECTRICIAN ASSIGNED TO THE KITCHEN
RENOVATION PROJECT BUT ALSO CHARGED (AND WAS
COMPENSATED FOR) REWIRING THE DISHWASHER

Scuderi argues that the "factual record" in support of claims against him "is so legally

deficient, that to allow it to proceed to trial would cause findings based on rank speculation and

conjecture". Further, Scuderi argues that there is "no affirmative, legally relevant evidence in

the record"[5] to show that Scuderi's conduct is the cause of the fire. Scuderi's argument is belied

by both his own deposition testimony as well as the estimate that he prepared for the work that

he performed.

Contrary to Defendants' argument, Estimate No. 348 constitutes the best evidence that

Scuderi performed the electrical connection to the dishwasher in question. The estimate sets

forth the scope of electrical work performed by Scuderi. Most importantly, the estimate

explicitly states that Scuderi is responsible for rewiring the dishwasher. Further, Scuderi not

only charged $60.00 for this work, but was also compensated for it by Bernstein. As a result, the

specific language used in (and the circumstances surrounding) the estimate are the best evidence

that Scuderi made the electrical connection at issue; at the very least, this document raises

genuine issues of material fact as to whether Scuderi did in fact make the connection.

Scuderi's deposition testimony further reinforces this inference. Scuderi conceded that

he was hired to perform electrical work for the kitchen project. Part of his retention included

rewiring the dishwasher and therefore making the electrical connection between the dishwasher

power wiring and the branch-circuit wiring, which Scuderi also concedes. At a minimum, after

---

[5] Scuderi asserts that Plaintiffs' warranty claim must fail because they has not produced any evidence of a warranty
between Bernstein and Scuderi. However, this argument is misplaced, since – as a matter of common law -- there is
an implied warranty that Scuderi's work will be performed in accordance with industry standards and in a
workmanlike manner, especially when Scuderi was the sole licensed electrician assigned to the project.

-19-

providing the estimate and receiving payment for making the electrical connection, Scuderi assumed a duty to ensure that the dishwasher was properly connected in accordance with industry standards and the National Electric Code.

Scuderi was also the only electrician hired to do electrical work on the project. Scuderi pulled the permits for this project. In doing so, he is responsible for all electrical work done pursuant to the permits, whether or not he himself performed that electrical work. According to Landis' Project Manager, it was the electrician who was going to connect the electrical power to the dishwasher. Further, it is "highly likely" that the Project Manager made a telephone call to Scuderi to notify him that all appliances, including the dishwasher, were ready to be hooked up. The Project Manager did not believe that the task of hardwiring the dishwasher connection should be completed by anyone other than Scuderi.

Based on the weight of the evidence, Plaintiffs have raised a genuine issue of material fact as to whether Scuderi completed the electrical connection at issue. Scuderi's deposition testimony as to why he was retained and what work he was required to do as the electrician on the kitchen project, as well as the estimate he prepared to complete that task, is the "affirmative, legally relevant evidence in the record" to justify Plaintiffs' claims against him. That other witnesses involved in the kitchen project, such as Andrew Kerr, Landis' Project Manager, and Margaret Rubino, Bernstein's Project Consultant, also refer to Scuderi as the most likely person to have completed the electrical connection at issue further reinforces that there is a genuine issue of material fact that Scuderi completed (or at the very least is responsible for) the improper connection. [6]

---

[6] Plaintiffs emphasize that Defendants' attempt to suggest that the absence of any one witness having first-hand knowledge that Scuderi in fact made the electrical connection at issue is misplaced. Defendants completed a number of depositions of Bernstein's housing staff to find out whether any of these deponents had any information about who made the electrical connection. These depositions included Winnifred Miller, Bernstein's housekeeper,

D.    PLAINTIFFS HAVE SET FORTH SUFFICIENT EVIDENCE OF A GENUINE
ISSUE OF MATERIAL FACT THAT WUERSTLIN EITHER CREATED
AND/OR PERPETUATED THE IMPROPER ELECTRICAL CONNECTION
BECAUSE WUERSTLIN WAS NOT ONLY THE LAST PARTY TO EVER
SERVICE THE DISHWASHER PRIOR TO THE FIRE LOSS BUT ALSO
LIKELY DISCONNECTED (AND RE-CONNECTED) THE ELECTRICAL
<u>CONNECTION AT ISSUE WHEN COMPLETING ITS SERVICE WORK</u>

Like Scuderi, Wuerstlin also argues that Plaintiffs cannot meet their burden of proof

because there is no evidence -- and only speculation -- in support of Plaintiffs' claims against

it. Wuerstlin argues that Plaintiffs have neither circumstantial nor direct evidence that inculpates

their service work in this lawsuit. Like Scuderi, Wuerstlin fails to acknowledge the complete

record in support of Plaintiffs' claims.

The remains of ROMEX wiring uncovered from the fire debris is direct evidence to

inculpate Wuerstlin. ROMEX wiring was the type of branch-circuit wiring found to be

connected to the dishwasher power wiring immediately after the fire. Scuderi, however, testified

that he only used "BX" wiring to facilitate this connection and left a "BX" supply cable for, if

his testimony is to be believed, the appropriate person (i.e., someone other than the sole licensed

electrician on the project) to make this connection. The different type of wiring used to connect

the branch-circuit wiring to the dishwasher power wiring raises an issue as to whether Wuerstlin

was the party which created (as opposed to perpetuated) the improper electrical connection.

That Wuerstlin was the last party to ever service (or have any involvement whatsoever

with) the dishwasher provides circumstantial evidence that Wuerstlin either created and/or

---

as well as Chris Wallace, Bernstein's Property Manager for the rental units attached to her residence, and Fitzalbert
Barclay, Bernstein's electrician for the rental units. Not surprisingly, none of these witnesses had any first-hand
knowledge as to who made the electrical connection. However, relying upon witnesses who have no first-hand
knowledge about *anything to do with the kitchen project* is not a basis for arguing that Plaintiffs do not have
sufficient evidence to support their claim against Scuderi. In fact, the only witnesses who have information
regarding the nature of the electrical connection and/or who made the connection is Scuderi (as well as Tom Smith,
Wuerstlin's service representative), if not Landis' employees. For that reason, Scuderi's testimony, and in
particular, his estimate, are the best evidence that he made the connection at issue, and any references to the
deposition testimony of Bernstein's housing staff in this regard is inapposite.

perpetuated the improper electrical connection.  There has been no evidence of any other party

servicing the dishwasher prior to the date of the fire, but after Wuerstlin performed its service

call, which occurred on August 11, 2004.  Roughly nine months later, the fire happened.  There

was no record of any party servicing a dishwasher during this interim period.

Wuerstlin's attempt to obfuscate this issue by suggesting that some unidentified third-

party serviced the dishwasher either four months after it was last serviced in August 2004, or

four months prior to the fire, underscores the tenuous and desperate nature of their argument.

Wuerstlin relies upon the deposition testimony of Michael Schaal, CFEI, Plaintiffs' cause and

origin expert, and his failure to precisely recall or correctly interpret the correct meaning of his

reference to "four months old" in his notes from a conversation he had with Mrs. Rubino shortly

after the fire occurred (and almost three years ago).  Contrary to Wuerstlin's argument, Schaal's

failure to properly recall the precise meaning of this reference is not tantamount to actual

evidence that shows that an unidentified third-party serviced the dishwasher four months either

prior to the fire or after its last service.  That Ms. Rubino or anyone else that was deposed in this

matter has not disclosed any identifiable third-party -- other than Wuerstlin -- as ever servicing

the dishwasher on or after August 11, 2004 further discredits Wuerstlin's argument on this issue.

Finally, Wuerstlin's argument that "the slack left by the licensed electrician, would not

have required disconnecting the supply line to the internal wires" is self-serving and

disingenuous.  There is a definite dispute as to exactly how much slack was left on the branch-

circuit wiring cable that was used to connect to the dishwasher.  There is no evidence as to

precisely how much slack was left by the party (presumably Scuderi) who made the electrical

connection to the dishwasher, since much of this wire was consumed by the fire.  To the

contrary, Wuerstlin's own representative, Tom Smith, who serviced the dishwasher on August

-22-

11, 2004, testified that he typically would have to disconnect the branch-circuit wiring and

dishwasher power line connection because there "typically" was not enough slack left in the

branch-circuit cable for him to complete his service work without making this disconnection.  In

fact, Smith's testimony that *at a minimum* there needed to be at least twenty-nine inches of slack

(which is the width of the countertop on top of the dishwasher) in order for him to even consider

completing his service work without disconnecting the electrical connection suggests that it was

unlikely that there was sufficient slack for him to complete his work without making a

disconnection.  This fact, coupled with the absence of any evidence that anyone other than

Wuerstlin ever serviced the dishwasher on August 11, 2004 or thereafter, provides the "unbroken

sequence of events" that ties Plaintiffs' claims to Defendants' conduct.  *See*, West Disinfecting

Co. v. Plumber, 44 APP. D.C. 245 (1916).

VI.     CONCLUSION

        Based upon the foregoing, Plaintiffs respectfully request that summary judgment be

denied.

        ORAL ARGUMENT IS REQUESTED, IF DEEMED NECESSARY BY THE COURT.

                                            Respectfully submitted,

                                    By:  /s/ Eric N. Stravitz

                                    MESIROW & STRAVITZ, PLLC

                                    Eric N. Stravitz, Esquire
                                    Bar No.: 238093
                                    1307 New Hampshire Avenue, N.W.
                                    Suite 400
                                    Washington, D.C. 20036
                                    202-463-0303 (Phone)
                                    202-861-8858 (Fax)
                                    eric@metroDClaw.com
                                    *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY** | : | |
| **and** | : | |
| **HARTFORD CASUALTY** | : | **CASE NO.: 1:06CV00379** |
| **INSURANCE COMPANY,** | : | |
| | : | **MAGISTRATE JUDGE: ALAN KAY** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANDIS CONSTRUCTION** | : | |
| **CORPORATION** | : | |
| **and** | : | **ORDER** |
| **WUERSTLIN APPLIANCE** | : | |
| **SERVICE** | : | |
| **and** | : | |
| **PAUL A. SCUDERI, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

Upon consideration of the Motion for Summary Judgment filed by Defendant, Paul A.

Scuderi, Inc., and any opposition in reply and any argument thereto, it is this _____ day of

_____ , 2008;

**ORDERED** that the Motion is **DENIED.**

_____
Alan Kay, U. S. Magistrate Judge

**Copies To:**

Edward J. Brown, Esquire
The Law Office of Edward J. Brown, LLC
3290 N. Ridge Road, Suite 210
Ellicott City, MD  21043
*Counsel for Wuerstlin Appliance Service*

Allan A. Noble, Esquire
BUDOW & NOBLE, PC
Suite 500 West, Air Rights Building
7315 Wisconsin Avenue, Suite 600
Bethesda, MD 20814
*Counsel for Landis Construction Company*

John A. Rego, Esquire
ANDERSON & QUINN
25 Wood Lane
Rockville, MD 20850
*Counsel for Paul A. Scuderi*

Eric N. Stravitz, Esquire
1307 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20036
*Counsel for Plaintiffs*

Brian E. Tetro, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103
*Counsel for Plaintiff,*
*Hartford Casualty Ins. Co.*

Mark E. Utke, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
*Counsel for Plaintiff,*
*Federal Insurance Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY** | : | |
| **and** | : | |
| **HARTFORD CASUALTY** | : | **CASE NO.: 1:06CV00379** |
| **INSURANCE COMPANY,** | : | |
| | : | **MAGISTRATE JUDGE: ALAN KAY** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANDIS CONSTRUCTION** | : | |
| **CORPORATION** | : | |
| **and** | : | **ORDER** |
| **WUERSTLIN APPLIANCE** | : | |
| **SERVICE** | : | |
| **and** | : | |
| **PAUL A. SCUDERI, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

Upon consideration of the Motion for Summary Judgment filed by Defendant, Wuerstlin

Appliance Service, and any opposition in reply and any argument thereto, it is this _____ day of

_____ , 2008;

**ORDERED** that the Motion is **DENIED.**

_____
Alan Kay, U. S. Magistrate Judge

-26-

**Copies To:**

Edward J. Brown, Esquire
The Law Office of Edward J. Brown, LLC
3290 N. Ridge Road, Suite 210
Ellicott City, MD 21043
*Counsel for Wuerstlin Appliance Service*

Allan A. Noble, Esquire
BUDOW & NOBLE, PC
Suite 500 West, Air Rights Building
7315 Wisconsin Avenue, Suite 600
Bethesda, MD 20814
*Counsel for Landis Construction Company*

John A. Rego, Esquire
ANDERSON & QUINN
25 Wood Lane
Rockville, MD 20850
*Counsel for Paul A. Scuderi*

Eric N. Stravitz, Esquire
1307 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20036
*Counsel for Plaintiffs*

Brian E. Tetro, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103
*Counsel for Plaintiff,*
*Hartford Casualty Ins. Co.*

Mark E. Utke, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
*Counsel for Plaintiff,*
*Federal Insurance Company*

PHLDMS1 4306860v.1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of May, 2008, a copy of the foregoing was

served first-class mail, postage prepaid upon:

Edward J. Brown, Esquire
The Law Office of Edward J. Brown, LLC
3290 N. Ridge Road, Suite 210
Ellicott City, MD  21043
*Counsel for Wuerstlin Appliance Service*

Allan A. Noble, Esquire
BUDOW & NOBLE, PC
Suite 500 West, Air Rights Building
7315 Wisconsin Avenue, Suite 600
Bethesda, MD 20814
*Counsel for Landis Construction Company*

John A. Rego, Esquire
ANDERSON & QUINN
25 Wood Lane
Rockville, MD 20850
*Counsel for Paul A. Scuderi*

By:    /s/ Brian E. Tetro_____
Brian E. Tetro, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA  19103
215-864-7070
215-789-6670
tetrob@whiteandwilliams.com
*Counsel for Plaintiff,*
*Hartford Casualty Insurance Co.*

PHLDMS1 4306860v.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of May, 2008, a copy of the foregoing was

electronically filed and forwarded to the following counsel:

Edward J. Brown, Esquire
The Law Office of Edward J. Brown, LLC
3290 N. Ridge Road, Suite 210
Ellicott City, MD  21043
*Counsel for Wuerstlin Appliance Service*

Allan A. Noble, Esquire
BUDOW & NOBLE, PC
Suite 500 West, Air Rights Building
7315 Wisconsin Avenue, Suite 600
Bethesda, MD 20814
*Counsel for Landis Construction Company*

John A. Rego, Esquire
ANDERSON & QUINN
25 Wood Lane
Rockville, MD 20850
*Counsel for Paul A. Scuderi*

By:  /s/ Eric N. Stravitz_____
Eric N. Stravitz, Esquire
Mesirow & Stravitz, PLLC
1307 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20036
202-463-0303 (Phone)
202-861-8858 (Fax)
eric@metroDClaw.com
*Counsel for Plaintiffs*