# EXHIBIT  7

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 54

1   Romex, that was the connection point to
2   the stranded conductors in the
3   dishwasher.
4       **Q. This is something you saw**
5   **yesterday?**
6       A. Yes.
7       **Q. Do you have a photograph of**
8   **whatever wires you were looking at**
9   **yesterday?**
10      A. Yes.
11      **Q. Is that produced?**
12      A. Yes.
13      **Q. Is it in one of these hundreds on**
14  **this disc?**
15      A. I believe it also is in my
16  report.
17      **Q. Okay. All right, fine.**
18      **Now, this was not raised in your**
19  **report, correct?**
20      A. That's correct.
21      **Q. And you have not read Mr. Neary's**
22  **report?**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 56

1   I guess we'll have to look at the CD with
2   the disc -- with the photos.
3       **Q. Okay. All right. What exactly**
4   **did you look at yesterday?**
5       A. The portion of the 14/2 Romex.
6       **Q. Is that all that's at SEA?**
7       A. I don't know. That's all that I
8   looked at yesterday.
9       **Q. And what portion?**
10      A. The portion that goes from where
11  there is a un-fire damaged insulation on
12  the Romex, to the termination of those
13  conductors.
14      **Q. And which end?**
15      A. At the end closest to the
16  connection to the dishwasher.
17      **Q. With -- to the internal**
18  **connection within the dishwasher?**
19      A. Correct.
20      **Q. How many conductors did you look**
21  **at?**
22      A. Three.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 55

1       A. No.
2       **Q. Okay. Had this ever come up**
3   **before?**
4       A. I don't believe so.
5       **Q. Okay.**
6       MR. UTKE: In this case or past
7   cases?
8       MR. BROWN: In this case? I'm
9   not familiar with it, so.
10      For the record, I don't believe
11  it's in Mr. Neary's report either, but
12  I'll take a look at that when we take a
13  break.
14  BY MR. BROWN:
15      **Q. Mr. McLauchlan, you've been**
16  **handed the photographs that accompany**
17  **your report. And they actually have**
18  **numbers on them, so we'll use those**
19  **numbers rather than exhibit numbers, to**
20  **keep things straight.**
21      A. Well, I thought it was in the
22  report photos, so, it doesn't appear so.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 57

1       **Q. All three lines? All three**
2   **components of the Romex?**
3       A. All -- yes.
4       **Q. Were any of those connected to**
5   **any wire nut?**
6       A. There was remnants of a wire nut
7   on one of the conductors.
8       **Q. Okay. And you didn't take that**
9   **off?**
10      A. No.
11      **Q. And what, if any, information**
12  **were you given about what the other two**
13  **ends represented? You have two --**
14      A. I'm not sure I follow your
15  question.
16      **Q. It made no sense, is maybe why**
17  **you couldn't follow it.**
18      **You have two other lines, right?**
19      A. There are two other conductors in
20  the Romex.
21      **Q. Conductors.**
22      **What information did you receive**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 58

1 about what the end of each of those lines
2 represented?
3     Like do you know whether they
4 were cut? Do you know where they were
5 claimed to have been within a wire nut?
6 Do you know what those ends are purported
7 to be?
8     A. My understanding, in discussing
9 the case with Mr. Schaal, is that nothing
10 was cut on that end of the Romex, so that
11 would be the condition that it was in, at
12 the time it was recovered after the fire.
13     Q. Did you make any independent
14 effort to verify that?
15     A. Other than to look at
16 Mr. Schaal's photographs, no.
17     Q. Have you measured those lines,
18 that is the three conductors within the
19 Romex line, to see if the ends are all
20 equal? Length?
21     A. No.
22     Q. Why not?

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 60

1     Q. That would be one possible
2 explanation?
3     A. Yes.
4     Q. What would the other possible
5 explanations be?
6     A. I don't know of any.
7     Q. Could it be that some of the
8 lines were either missing or destroyed in
9 the fire, some portion of the line?
10 Conductor?
11     A. My opinion, that's not a possible
12 explanation.
13     Q. Could it be that they were cut?
14     A. After the fire?
15     Q. Yes.
16     A. My opinion, no.
17     Q. Why?
18     A. There was no indication on the
19 ends of those conductors that they had
20 been subjected to a cutting action.
21     Q. Did you look for that?
22     A. Yes.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 59

1     A. There's no specific reason why I
2 didn't do it. It's something I didn't
3 do.
4     Q. Does the visual appearance
5 indicate that the lines may not all be
6 the same length?
7     A. I don't know that I can say that.
8     Q. If, in fact, measurements would
9 show they're not the same length, would
10 that be something that would be
11 significant to you?
12     A. No.
13     Q. Why not?
14     A. That could mean that the person
15 installing them, for whatever reason,
16 decided to cut them on a non-even basis
17 when the insulation was stripped back.
18     Q. Do you have any reason to believe
19 that was done?
20     A. If they are uneven, that would be
21 a explanation for why they would be
22 uneven.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 61

1     Q. What indication did you see on
2 the end of those conductors? Did you see
3 anything else of significance?
4     A. There was some electrical
5 activity on the tips of one of the
6 conductors.
7     Q. Just one?
8     A. Yes.
9     Q. Which one?
10     A. It was one of the ones that did
11 not have a wire nut remains on them. But
12 beyond that, I don't know how you'd
13 identify it.
14     Q. Do you know what phase it was?
15     A. No.
16     Q. Did you make any effort to find
17 out?
18     A. No.
19     Q. Did you make any effort to
20 determine whether that could have been a
21 cause versus a result of the fire?
22     A. I did consider that.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 62

1    Q.  We.
2        Re you able to make a
3    determination?
4    A.  Yes.  I concluded that that was
5    not a result of the fire.
6        Q.  Is that the only determination
7    you could make?
8    A.  I'm not sure I follow your
9    question.
10   Q.  Well, I'm trying to make sure if
11   you're telling me it was not a result of
12   the fire, that does not necessarily mean
13   you found anything else.  It may mean you
14   think it's the cause.  It may mean you
15   don't have enough information to make any
16   other opinions, it may mean a lot of
17   things.
18       I don't see any of these opinions
19   in your report, so I'm just asking the
20   questions right now to try to get a
21   little background on what you did
22   yesterday.  But, without having any

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 64

1    identified in your report?
2    A.  On Page 3, in the first full
3    paragraph, starting at the third line
4    from the bottom of that paragraph:  There
5    was evidence of electrical activity in
6    the power conductor which did not show
7    any evidence of a wire nut connection.
8        Q.  Beyond that, do you think you
9    made any reference to this issue?
10   A.  No.
11       Q.  And even at the time of your
12   report, do you know which wire this was,
13   which conductor this was?
14   A.  No.
15       Q.  Why not?
16   A.  I was not at the scene.  I was
17   not capable of determining which -- which
18   wire was which.
19       Q.  Did you ask Mr., Neary the
20   electrical engineer?
21   A.  No, I didn't.
22       Q.  Why not?

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 63

1    advance notice of this, I'm just kind of
2    playing it by ear, as we say.  Obviously
3    waiving any objection I would have to
4    anything that wasn't disclosed before we
5    took your deposition.
6        What I'm trying to find out is,
7    when you say you've reached an opinion,
8    at least that you don't think it was a
9    result of the fire, is that the only
10   opinion you've reached based on this
11   examination yesterday?
12   A.  Well, I think part of the problem
13   is that I'm -- I'm answering the
14   questions not solely limited to any
15   information I obtained yesterday.
16       The condition of the wiring was
17   something I had observed before I did my
18   report, and the condition of the end that
19   I'm describing is the same as it was
20   before I did my report.  And is one of
21   the basis my report.
22       Q.  Where do you believe this is

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 65

1    A.  My understanding was that he was
2    not at the scene either.
3        Q.  So you're telling me it would be
4    impossible to figure this out if a
5    thorough investigation was performed?
6    A.  I know that I'm not capable of
7    doing it.  It may be that Mr. Neary can,
8    or someone else can.
9        Q.  All right.  Was that the sole
10   piece of evidence you looked at
11   yesterday?
12   A.  Yes.
13       Q.  Since the time of the two
14   inspections marked on your -- noted on
15   your bill, which has been marked as
16   Exhibit 4, have you looked at any
17   evidence?
18   A.  No.
19       Q.  Okay.  So the last time you saw
20   the evidence would have been October
21   25th, of 2006?
22       That's what it says.  I'm not

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 122

1 no scuffing of the insulation, and no
2 load applied to the wire nutted
3 connection.
4    **Q. Okay. In connection to what?**
5 **How did you finish that sentence?**
6    A. The wire nut connection, between
7 the Romex cable and the stranded
8 conductors for the dishwasher power
9 supply.
10    **Q. Okay. Let me take them one by**
11 **one then.**
12    **Well, with those -- were those**
13 **the sole three pieces of information you**
14 **had, which started your working**
15 **hypothesis that there was a electrical**
16 **connection issue?**
17    A. Yes.
18    **Q. Do you have any other pieces of**
19 **information related to that topic?**
20    A. I believe that Mr. Schaal, I
21 think I said this, that he looked for
22 evidence of a junction box at his site

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 124

1 **first entry?**
2    A. Okay. That's correct.
3    **Q. Okay. All right. And do you**
4 **have an understanding as to what, if any,**
5 **evidence had disappeared by the time Mr.**
6 **Schaal got out there?**
7    A. I don't have any information on
8 that.
9    **Q. Do you have any understanding as**
10 **to whether the temperatures involved**
11 **would have been high enough to melt or**
12 **destroy a junction box?**
13    A. My opinion is they would not be
14 high enough to destroy a steel junction
15 box.
16    **Q. Okay. And what information do**
17 **you have as to what the junction box**
18 **would have been made of?**
19    A. The exemplar that I looked.
20    **Q. And what year was the exemplar?**
21    A. Pardon me?
22    **Q. What year was the exemplar?**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 123

1 inspection, and didn't find one.
2    **Q. Is that recorded in your report**
3 **anywhere?**
4    A. Yes.
5    **Q. Okay. What do you base that on?**
6 **Your belief that he looked, and didn't**
7 **find one?**
8    A. Him telling me that.
9    **Q. Did you ask him why he would be**
10 **looking for a junction box?**
11    A. I didn't ask him specifically
12 why. He told me he looked for the
13 junction box because he assumed that
14 there had to be one in order to make this
15 wire nutted connection.
16    **Q. And this was all during that**
17 **first conversation back in July of 2005,**
18 **I'm sorry --**
19    A. Yeah. It was August actually.
20    **Q. Yeah. I don't want to trick you.**
21    **Well, no. It says July 18, '05**
22 **meeting with Mr. Schaal. That's your**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 125

1    A. That would have been -- well, it
2 was looked at in -- where is my --
3    **Q. March 2nd, '06.**
4    A. Okay.
5    **Q. I'm reading that from your bill.**
6    A. It was looked at March 2nd of
7 2006. And I don't know the actual year
8 of the exemplar, but it was represented
9 to counsel for the homeowner that it was
10 the -- the exemplar that they would say
11 was similar to the one in -- the
12 dishwasher involved in the fire.
13    **Q. And you made no effort to fact**
14 **check that?**
15    A. No.
16    **Q. All right. So, with respect to**
17 **this working hypothesis, you've got these**
18 **pieces of information, what do you then**
19 **do?**
20    A. I then look at the -- the
21 research that's been done by the various
22 authoritative sources that I've provided

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 126

1  in my file. And that lead me to a
2  conclusion that there was, in fact, a
3  condition created by the improper
4  installation of the power supply that
5  would lead to the fire, that occurred.
6  **Q. Well, before you can go from this**
7  **possible hypothesis to an opinion, you**
8  **have to find additional evidence, test**
9  **it, confirm it, consider the**
10 **alternatives, correct?**
11 A. Yes.
12 **Q. Okay. What did you do to test**
13 **this hypothesis?**
14 A. Again, that was the inspection of
15 the other physical evidence and the x-ray
16 analysis of the dishwasher.
17 **Q. Okay. Well, you've got this**
18 **information. You told me no wire nut, no**
19 **J-box, no Romex connector, right?**
20 A. Correct.
21 **Q. Now, you've got to take that as a**
22 **possible hypothesis, and test it.**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 127

1  **So, you said x-ray inspection,**
2  **and a visual inspection?**
3  A. Yes.
4  **Q. Okay. What did you learn during**
5  **the x-ray inspection that gave you proof**
6  **that, A, there was some electrical**
7  **connection problem, B that was a possible**
8  **cause of a fire at issue?**
9  A. The x-ray inspection allowed me
10 to eliminate any other electrical or
11 mechanical malfunction or defect.
12 **Q. Every other one?**
13 A. Yes.
14 **Q. How?**
15 A. By the absence of electrical
16 activity in these conductors.
17 **Q. What do you mean?**
18 A. There was no arcing, melting,
19 beading, in any of the other conductors.
20 **Q. And if that turns out to be**
21 **incorrect, then would your opinion be**
22 **based on an incorrect assumption?**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 128

1  MR. TETRO: Object to form. Go
2  ahead.
3  Do you want to clarify your
4  question?
5  A. Yeah. I'm not following the
6  question.
7  BY MR. BROWN:
8  **Q. Well, sure.**
9  **You indicated you are confident**
10 **there was no arcing or beading on any**
11 **other cables or conductors or lines**
12 **inside that dishwasher, correct?**
13 A. That's correct.
14 **Q. All right. That's a necessary**
15 **component of your opinion, correct?**
16 A. That's part of my opinion, yes.
17 **Q. But it's a necessary component?**
18 A. Yes. It allows me to rule out
19 other potential explanations.
20 **Q. Okay. And if that was an**
21 **incorrect piece of information, you'd**
22 **have to reconsider other explanations,**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 129

1  correct?
2  A. Yes.
3  **Q. Okay. Did you ever ask anybody,**
4  **whether they saw, particularly any**
5  **electrical engineer, whether they saw any**
6  **evidence of beading on any of the other**
7  **electrical lines? Conduits, conductors?**
8  A. No.
9  **Q. This is strictly your own**
10 **determination?**
11 A. Mine, and Mr. Schaal's.
12 **Q. Is he an electrical engineer?**
13 A. No. But he is an experienced
14 fire investigator, who looks at things
15 like electrical components and failures.
16 **Q. You had access to Mr. Neary,**
17 **obviously, correct?**
18 A. Yes.
19 **Q. You spent some time with him**
20 **yesterday.**
21 A. Yes.
22 **Q. Did you ever ask him if he found**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 130

1   beading on any other electrical lines or
2   connectors?
3      A. I don't know that I came right
4   out and asked him that. I know that I
5   asked him if he felt there were any other
6   explanations for this fire.
7      Q. But your answer to my question
8   is: You didn't ask him that?
9      A. I didn't ask him specifically
10  that, no.
11     Q. Okay. Did the x-ray examination
12  give you any other insight into any
13  electrical cause of the fire?
14     A. It gave me the basis for
15  concluding that there was no other
16  explanation, from an electrical
17  standpoint.
18     Q. What allowed you to rule out any
19  other sign of beading or arcing on any
20  other lines? Is that what you said?
21     A. I testified that I did not find
22  any evidence of that; so, it's not a

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 131

1   matter of ruling it out. It's that it
2   wasn't there.
3      Q. Okay. Anything else then, that
4   the x-ray examination showed you?
5      A. I don't think so.
6      Q. And then you said you did the
7   visual inspection, correct?
8      A. Correct.
9      Q. What did that show you?
10     A. That showed evidence of the
11  electrical activity in the area, of the
12  unwire nutted Romex termination, that was
13  used to -- where the connection to the
14  stranded appliance conductor was.
15     Q. Okay. Well, is it a necessary
16  component of your theory that there was a
17  wire nut on that line, that conduit --
18  excuse me, that conductor, or not?
19     A. In order for the dishwasher to
20  work, there had to be a connection
21  between the Romex and the stranded
22  appliance power conductors.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 132

1   Q. On all three conductors?
2   A. Yes.
3   Q. All three had to be connected?
4      A. The ground didn't have to be
5   connected, but it's -- it would be an
6   improper installation to not connect the
7   ground to the building ground.
8      Q. Okay. But you're kind of giving
9   me both answers.
10     When I said all three had to be
11  connected, you said yes, and then you
12  said no. Which is it?
13     A. Proper installation technique
14  requires that the ground connection be
15  made, but the dishwasher could run
16  without a ground connection. Although,
17  it would be unreliable, based on the
18  electronic controls in the unit.
19     Q. If the ground was not made, would
20  that have any role in this fire? If
21  there was not a connection on the ground
22  line, do you believe that would be a

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 133

1   cause or a contributing factor to this
2   fire?
3      A. If the ground was not made, no.
4      Q. That may have been an
5   electrocution or a shock hazard but it's
6   not a fire hazard, correct?
7      A. That's correct.
8      Q. You don't know whether the line
9   that you believe didn't have a wire nut
10  on it, was the ground or the neutral, or
11  the power phase, do you?
12     A. No I don't. The -- clearly, the
13  evidence of arcing electrical activity on
14  that line tells me that it was either the
15  line or the neutral.
16     Q. My question that got us off in
17  this tangent, was: Do you believe that
18  either the power line or the neutral had
19  a wire nut on it?
20     A. And I testified that without a
21  connection of some sort, there had to
22  have -- that the unit wouldn't have

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 138

1 connected?
2    A. I can't say.
3    Q. Without knowing how those two
4 lines were connected, how can you say
5 there was an improper connection?
6    A. Because again there is no
7 evidence of wire nuts being used on the
8 two conductors. And there is electrical
9 activity on one of those two conductors,
10 which again is consistent with, at a
11 minimum, an improper wire nutted
12 connection, or, the failure to use any
13 wire nut.
14    Q. Okay. Can you tell me, or tell
15 the jury if we were in trial right now,
16 how either of those other two connections
17 were made? You know one is in a wire
18 nut, correct?
19    A. Correct.
20    Q. Can you tell the jury, with
21 anything beyond your speculation, how the
22 other two were made?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 139

1    A. Not unless again someone comes
2 forward and says I made that connection,
3 and I have a picture of a wire nut being
4 on all three of these, and, or I'll
5 testify under oath that I made three wire
6 nutted connections.
7    Q. And have you read Sal Fiorito's
8 deposition yet?
9    A. No.
10    Q. Have you read Maggie Rubino --
11 Margaret Rubino's deposition yet?
12    A. No.
13    Q. Do you know who these people are?
14    A. No, I don't.
15    Well, I know that Fiorito is a
16 contractor. And Rubino I believe was
17 employed by the homeowner.
18    Q. Do you know whether Mr. Fiorito
19 believes he has the knowledge of how to
20 wire a three-line -- three-conductor
21 installation with wires nuts similar to
22 the one that was in the BOSCH dishwasher?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 140

1    A. I have not seen his testimony. I
2 don't know.
3    Q. Do you know whether he would have
4 had access to that dishwasher after its
5 delivery?
6    A. No, I don't.
7    Q. Do you have any information about
8 what Mr. Fiorito did or didn't do with
9 respect to that dishwasher?
10    A. No.
11    Q. Did you ever ask?
12    A. I, again, was not given any
13 testimony, except for the two witnesses
14 that are in my file there. And, to my
15 knowledge, no other depositions existed.
16    Q. Would you agree that before you
17 can say something is improper, you have
18 to know what it is?
19    A. Yes.
20    Q. Okay. In this case, you don't
21 know what the connection was for either
22 of those two lines, correct? Those two

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 141

1 conductors that didn't have the remnants
2 of a wire nut?
3    A. Well, the basis for my opinion
4 that it was not correct --
5    Q. Well, my question was a little
6 different. Okay. My question was -- I
7 think you just agreed, you have to know
8 what something is before you can say it
9 was proper or improper, right?
10    A. That's correct.
11    Q. You don't know, I think you told
12 me what the connection was for these
13 other two conductors, right?
14    A. I don't know whether there was a
15 wire nut on there. However --
16    Q. Well, you don't know what it was
17 at all, correct? Didn't we just spend a
18 lot of time just getting to that point?
19    A. I know that there was a physical
20 connection in order for the dishwasher to
21 work, but the details of it, I don't
22 know.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 142

1  Q. Okay. Did you check the wire nut
2  that was still there, to see whether that
3  seemed to be a tight and sound connection
4  or not?
5  A. Yes.
6  Q. Okay. And was it?
7  A. Yes.
8  Q. Okay. So, the only information
9  you have was that on the one wire, where
10 we know a wire nut was used, it appears
11 to have been done properly, correct?
12 A. Yes.
13 Q. That is the only piece of
14 information you really have about the
15 connection point on any one of those
16 three conductors?
17 A. No, that's not true. I testified
18 there is no indication in the form of
19 markings on the conductors that you'd
20 expect to see had a wire nut been
21 properly attached.
22 Q. Or even improperly attached?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 143

1  A. If it was improperly attached,
2  you may not see the markings that I would
3  expect to see.
4  Q. It's a copper line, it there was
5  any rotation whatsoever, there'd be at
6  least some striation mark, would there
7  not?
8  A. If it was tightened properly,
9  yes.
10 Q. Well, if there's any rotation, it
11 might not be a full biting rotation, but
12 if you take a copper line -- copper is a
13 soft metal, right?
14 A. Yes.
15 Q. And you put it inside a
16 traditional wire nut and you turn it at
17 all, you're going to have some evidence,
18 if you look under a microscope and see
19 whether there's a striation mark,
20 correct?
21 A. If you've tightened it to the
22 point that you're making proper physical

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 144

1  contact between the conductors, yes, I'd
2  expect to see that.
3  Q. Well, if there's any contact,
4  whether it's tight or not tight, if you
5  have the copper against the metal edge
6  and you just rotate it around, if you
7  look under a microscope and you look
8  careful enough, you're going to see at
9  least some evidence of a striation mark,
10 correct?
11 A. I'm not certain that you will if
12 it's -- if it's so loose that you're just
13 barely holding the two conductors in
14 contact with each other.
15 Q. Did you look at it under a
16 microscope?
17 A. No, I didn't.
18 Q. Why not?
19 A. I looked at it, you know, with a
20 visual eye, and --
21 Q. Yesterday?
22 A. Yesterday.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 145

1  Q. Is that the first time?
2  A. No. I've looked at it on all of
3  the inspections that I did starting in
4  August of 2005.
5  Q. So, at least three of those were
6  conducted at a lab type facility, right?
7  A. They were at Mr. Schaal's
8  facility, yes.
9  Q. And were at SEA yesterday?
10 A. Yes.
11 Q. Pretty safe bet they have
12 microscopes there, correct?
13 A. That's correct.
14 Q. Why didn't you look at it under a
15 microscope?
16 A. Because the properly made wire
17 nutted connections that I've seen, always
18 do leave visible striations that are --
19 you don't need a microscope to see.
20 Q. You don't know how these two
21 lines were connected, these conductors
22 were connected? I think we established

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 166

1  that was being accumulated and being
2  considered throughout the investigation.
3      **Q.  Once you had focused on a working**
4  **hypothesis that a connection, which you**
5  **don't know how it was made, but however**
6  **it was made, was improper and could be a**
7  **cause of the fire, once you reached that**
8  **point, did you then consider any**
9  **alternatives after that point?**
10     MR. TETRO:  Object to format.
11     A.  As I testified the -- the
12  investigation that I had done had allowed
13  me to really rule out anything beyond the
14  improper connection.
15  BY MR. BROWN:
16     **Q.  My question is a little**
17  **different.**
18     **Chronologically, you're now at**
19  **this point in the protocol that we**
20  **discussed, did you then consider any**
21  **alternative explanations from that point**
22  **forward?**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 168

1      A.  Because of -- no, because of
2  the -- the fact that the area of origin
3  of this fire was so clearly defined,
4  there weren't really any other things
5  that I could consider, that the origin
6  and cause investigator hadn't already
7  ruled out.
8      **Q.  Where was the area of origin?**
9      A.  The dishwasher, base of
10  dishwasher.
11     **Q.  How many different electrical**
12  **components were there within that area of**
13  **origin?**
14     A.  Many.
15     **Q.  Did you go item by item, to try**
16  **to rule in or out, each of those many**
17  **items?**
18     A.  I looked at the x-ray of all the
19  conductors.  I visually looked at the
20  conductors, looking for any evidence of
21  electrical activity, and found none.
22     **Q.  Did you examine anything other**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 167

1      A.  There were no other alternatives
2  that I hadn't previously considered at
3  that point.
4      **Q.  So, you didn't consider any**
5  **others?**
6      A.  None.
7      **Q.  At this point?**
8      A.  Other than the ones I had
9  previously considered.
10     **Q.  And what electrical ones do you**
11  **believe you previously considered?**
12     A.  An electrical failure within the
13  power and signal conductors, inside the
14  dishwasher.
15     **Q.  Did you do any testing on that**
16  **other, than your visual and x-ray**
17  **examination?**
18     A.  No.
19     **Q.  Okay.  And other than that, did**
20  **you do anything to rule in or rule out or**
21  **consider or test any other hypothesis,**
22  **any other potential causes?**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 169

1  **than the conductors?**
2      A.  Yes.  I looked at the major
3  components, the motors and so forth.
4      **Q.  Okay.  And anything other than**
5  **conductors and the major components?**
6      A.  No.
7      **Q.  You never looked at the**
8  **capacitor, correct?**
9      A.  Well, I would consider that a
10  major component.
11     **Q.  Did you look at the capacitor?**
12     A.  Yes.
13     **Q.  Do you have photographs of that?**
14     A.  Yes.
15     **Q.  Did you do any examination or**
16  **testing to see whether the capacitor was**
17  **a cause, a potential cause of this fire?**
18     A.  Again, I looked at it visually,
19  and it showed evidence of being a victim
20  of the fire.
21     **Q.  Beyond the visual inspection, did**
22  **you do anything?**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 174

1    A. Correct.
2    **Q. So, you believe you got it at or**
3    **about the time of its filing?**
4    A. Well, the transmittal letter
5    should indicate when I received it.
6    **Q. Yeah. I don't -- well, hold on a**
7    **second. I didn't see a transmittal**
8    **letter on this, but maybe I got things**
9    **confused.**
10        MR. TETRO: Should be, I think.
11   BY MR. BROWN:
12   **Q. Okay. Well, on August 30th,**
13   **there's one that says: Enclosed please**
14   **find defendant's -- and this wasn't**
15   **attached to it, but do you believe they**
16   **were all sent to you at the same time?**
17   A. Yes.
18   **Q. Okay. That's fine. All right.**
19       **So, from August 30th, 2007 to the**
20   **present, you've never looked at the**
21   **capacitor, never asked to look at it, and**
22   **simply relied upon a recollection of your**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 176

1    **Q. But my question is: Is there a**
2    **hole?**
3    A. Yes.
4    **Q. But you were saying you made a**
5    **determination it wasn't a blow hole?**
6    A. No. It was fire damage.
7    Exposure.
8    **Q. What's the hole look like?**
9    A. It's about a quarter inch in
10   diameter.
11   **Q. Is it round?**
12   A. Generally, yes.
13   **Q. How do you distinguish between a**
14   **blow hole and just a hole that's from**
15   **fire damage?**
16   A. The blow holes that I've seen
17   where a capacitor clearly failed and
18   initiated a fire, literally the whole
19   casing has blown outward, and there is
20   this blown outward pattern that remains
21   even after the fire.
22   **Q. Is there any scientific**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 175

1    **visual inspection and your actual review**
2    **of photographs about the capacitor**
3    **itself?**
4    A. Photographs as well as x-rays.
5    **Q. Okay. But I thought you said the**
6    **x-rays don't give you any information**
7    **about the capacitor?**
8    A. No. I said there was no
9    indication in the x-rays of any
10   malfunction or defect in the electrical
11   activity in the capacitor.
12   **Q. Can it tell you anything one way**
13   **or the other?**
14   A. Yes.
15   **Q. Okay. What did you look for?**
16   A. I looked for any indication of a
17   blow hole, that would show that there was
18   a internal malfunction of the capacitor.
19   **Q. Is there any hole in the**
20   **capacitor at all?**
21   A. There is evidence of melting of
22   the capacitor.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 177

1    literature that would verify that the way
2    **you determine a blow hole is only if it**
3    **looks like what you just described?**
4    A. I don't know.
5    **Q. Did you check any scientific**
6    **literature whether the hole in the**
7    **capacitor could reasonably be interpreted**
8    **to be a blow hole?**
9    A. I don't know that I specifically
10   looked at any literature for that, no.
11   **Q. If the capacitor exploded, it**
12   **would have a hole, right?**
13   A. Yes.
14   **Q. Okay. You don't believe the**
15   **capacitor exploded at all during the**
16   **fire?**
17   A. No. I believe that it was
18   subjected to external heating and it
19   melted.
20   **Q. And it melted and left a hole?**
21   A. Yes.
22   **Q. Any other electrical components**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 186

1      MR. REGO: Off the record.
2      (Discussion had off the record.)
3   BY MR. BROWN:
4      Q. Is there a photo in here?
5      A. Actually, photo number 11, it's
6   out of the picture but that -- but it's
7   on that end of the conductors. I have a
8   photo on my disc that shows that
9   conductor that has the electrical beading
10  on it.
11     Q. Photo 11, though, is clearly
12  designed to show that remnant of the wire
13  nut, correct?
14     A. Yes.
15     Q. Okay. At the bottom -- you still
16  have your report? At the bottom of page
17  2, you make reference to an electrical
18  metal fish tape?
19     A. Yes.
20     Q. Do you have any reason for noting
21  that in your report?
22     A. It's documenting what was there.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 188

1   out?
2      A. The fish tape is normally used
3   for pulling conductors at the time of
4   installation.
5      Q. Well, you wouldn't need a fish
6   tape if there was no dishwasher in there,
7   correct?
8      A. I don't understand the question.
9      Q. Well, if you don't have a
10  dishwasher in there, you wouldn't be
11  running a fish tape underneath the
12  dishwasher?
13     A. Correct.
14     Q. Okay. And it was underneath what
15  you found, correct?
16     A. Yes.
17     Q. Okay. You indicate, I'm on Page
18  3, now, sir, that there was no evidence
19  of a junction box. Were you ever able to
20  make a determination whether this
21  dishwasher ever had a junction box?
22     A. I -- I concluded that there was a

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 187

1      Q. Do you believe that has any
2   affect, impact, significance on your
3   opinions in your investigation?
4      A. My opinion is it didn't cause the
5   fire.
6      Q. Why did you note it then?
7      A. Because I wanted to be able to
8   explain what I was seeing in the
9   photographs some years after I wrote the
10  report, if necessary.
11     And, also, it seems to me that is
12  not good installation practice to leave a
13  fish tape under a appliance.
14     Q. Do you have any information as to
15  how long that fish tape had been there?
16     A. No.
17     Q. Do you know who did it, left it
18  there?
19     A. No, I don't.
20     Q. Would the fish tape only be used
21  if somebody was trying to work on the
22  dishwasher without pulling it all the way

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 189

1   junction box, based on the installation
2   instructions.
3      Q. Was there any physical evidence
4   that this one ever had a junction box?
5      A. No, there was no evidence of,
6   that it either had or didn't have a
7   junction box, because nothing was found.
8      Q. Well, I'm asking: Do you know
9   whether the junction box in this, screws
10  in, how it would have been attached to
11  the dishwasher?
12     A. It's, I believe, a riveted
13  connection to the plastic.
14     Q. What plastic?
15     A. The plastic casing at the base.
16     Q. So, if it's riveted, to get rid
17  of it, you'd have to actually pull out
18  the rivet, or if it's steel, you'd have
19  to pull the rivet out of the plastic,
20  correct?
21     A. If it's riveted, yes.
22     Q. Okay. And you weren't able to

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 190

1  tell that?
2      A.  Well, I'd -- I don't know whether
3  it was riveted or it had a star type --
4  in looking at the connection, it was
5  either a rivet or a -- I forget what you
6  call the type of fastener that has like a
7  star-shaped pattern.
8      Q.  Torques
9      A.  Not a torques.  It's a
10  different --
11      Q.  Well, permanent attachment as
12  opposed to a screw in, screw out
13  attachment?
14      A.  Yeah.  I don't recall whether it
15  was permanent or screw in, screw out.
16      Q.  Okay.  If it was a screw in,
17  screw out, do you know whether it screwed
18  into metal or screwed into plastic?
19      A.  No, it screwed into plastic.
20      Q.  Was there any plastic left that
21  this thing would have been screwed in?
22      A.  No.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 191

1      Q.  If it had been screwed into
2  metal, you could tell whether or not
3  there had been one, correct?
4      A.  Yes.
5      Q.  But you don't believe there was,
6  therefore, you didn't do that test?
7      A.  I'm sorry, what test would that
8  be?
9      Q.  Well, whatever the tests, whether
10  or not a screw in could be put in or put
11  out a metal?
12      A.  It was not screwed into metal.
13  The exemplar showed it went into plastic.
14      Q.  And again with respect to the
15  junction box evidence, you based that
16  on -- you say also review of the
17  photographs taken at the fire scene show
18  no evidence of junction box in the fire
19  debris.
20      What fire debris was
21  photographed?
22      A.  Mr. Schaal photographed the area

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 192

1  underneath the counter where this
2  dishwasher was installed.
3      Q.  Was the debris still there when
4  he did his photographs?
5      A.  There was some components there,
6  yes.
7      Q.  Would proper investigative
8  techniques, if you were trying to prove
9  the absence of an item, have required
10  preserving that item -- I'm sorry, that
11  pile of debris?
12      A.  If you were -- yes, you would
13  want to collect any debris that remained,
14  to document what was there.
15      Q.  If you believe that Mr. Schaal
16  was actually aware that he should be
17  looking for a junction box, and there was
18  a pile of debris, proper investigative
19  technique would have been to preserve
20  that entire pile of debris, so that
21  others, including those who might be
22  blamed for this fire, would also have an

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 193

1  equal right to look at that, correct?
2      A.  Yes.
3      Q.  Okay.  Do you know if Mr. Schaal
4  did that?
5      A.  My understanding is that Mr.
6  Schaal brought back everything that
7  remained of this dishwasher, including
8  any debris.
9      Q.  Did you ever look through the
10  pile of debris?
11      A.  I looked at all the evidence that
12  he recovered, and I found no evidence of
13  any --
14      Q.  Do you believe you looked through
15  a pile of debris?
16      A.  There was -- there were loose
17  debris in a bag that I looked at, yes.
18      Q.  Where?
19      A.  At Mr. Schaal's facility.
20      Q.  You conclude that paragraph,
21  saying there was no evidence of a strain
22  relief fitting in the fire debris with

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 194

1 the dishwasher?
2     A. Yes.
3     Q. Is that the same thing as the
4 Romex connector that you talked about
5 before?
6     A. Yes.
7     Q. Okay. What would that strain
8 relief fitting have been made of?
9     A. Steel.
10     Q. And does this come with the
11 dishwasher?
12     A. No. It's supplied -- it's an
13 indication in the installation
14 instructions that the installer has to
15 supply it.
16     Q. You said I -- you -- you are
17 using the Romex connector as synonymous
18 with this term?
19     A. Yes.
20     Q. But your testimony was you
21 believe it supplies both strain relief
22 and scuff protection?

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 196

1     Q. There's two angles here. If you
2 pull it in or out, that's one sort of
3 strain relief?
4     A. Yes.
5     Q. Part of the strain relief that
6 that supplies is, if somebody pulls the
7 machine straight out, you don't jerk on
8 the part of the conductors that are
9 actually connected to the copper stranded
10 conductors, right?
11     A. Yes.
12     Q. Okay. How many times do you
13 believe that this dishwasher was ever
14 pulled out after its initial
15 installation?
16     A. I'm aware of the one time it was
17 pulled out to replace the pump.
18     Q. Do you believe that any point
19 during that one time, that you're aware
20 of that it was pulled out, that there was
21 undue force put on any of the connectors?
22 I.e., force that a strain relief device

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 195

1     A. Yes.
2     Q. Do you believe that scuff, and by
3 scuff you mean abrasion of insulation on
4 any sharp edge?
5     A. Yes.
6     Q. Do you believe that
7 scuff/abrasion played any role in this
8 fire?
9     A. I did not find any evidence of
10 arcing consistent with a scuff of the
11 insulation.
12     Q. Okay. And do you believe that
13 the absence of a strain relief played any
14 role in this fire?
15     A. Yes.
16     Q. Why?
17     A. Because the strain relief
18 provides protection against movement of
19 the wire nutted connections, if any sort
20 of movement is made of the dishwasher
21 through either vibration or through
22 servicing.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 197

1 might have protected?
2     A. I believe that the failure is
3 certainly consistent with a strain being
4 put on the wire nutted connections due to
5 a absence of a strain relief.
6     Q. Right. That's a slightly
7 different question. That's not an answer
8 to my question.
9         My question is this: Do you have
10 any evidence or any information which
11 supports an opinion that on the one time,
12 in which you're aware that the dishwasher
13 may have been pulled out, that any strain
14 was placed on any wires, any line, any
15 conductors?
16     A. Well, the absence of any strain
17 relief means that any movement of those
18 wires will put -- be transmitted to the
19 wire nutted connection as the wires are
20 moved, so, inherently there will be some
21 load applied in the absence of any sort
22 of Romex connector.

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 214

1      Q.  With respect to the vibration,
2  what element or what amount of vibration
3  does this dishwasher impose upon its
4  electrical connection, between the supply
5  line and the stranded copper line?
6      A.  Any piece of equipment that has a
7  motor in it, and rotating parts, has the
8  ability to impose or transmit vibrations
9  to anything that's connected to it.
10      Q.  Are you able to quantify the
11  vibration that this type of dishwasher
12  imposes?
13      A.  No.
14      Q.  Why not?
15      A.  Again, you would have to know
16  the -- how the impeller was balanced on
17  the pump.
18          If there was any non-linearity in
19  the motor, that would create vibration.
20  And all that is destroyed.
21      Q.  Did you run any test on the
22  exemplar to see how much vibration it

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 216

1  unbalanced or an imbalanced impeller,
2  propeller, whatever you said?
3      A.  Impeller.
4      Q.  Impeller.  Or any of those
5  things?
6      A.  Right.  Again, that's not the
7  type of thing that a user would
8  experience.  It's -- it's internal to the
9  dishwasher.
10      Q.  If this connection was within a
11  junction box, wouldn't that in fact
12  result in more vibration imposed by the
13  connection points?
14      A.  No, I don't agree with that.
15      Q.  Why?
16      A.  If it's in a junction box, with a
17  Romex clamp, basically everything that is
18  inside that junction box is moving
19  with -- is moving with the dishwasher.
20  And there's no differential movement due
21  to the fact that the Romex is not
22  attached to the dishwasher, but the

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 215

1  might impose, under a best case and worst
2  case scenario, to try to get a range?
3      A.  No.
4      Q.  Why not?
5      A.  Again it's -- to me, it's not
6  representative of this specific
7  dishwasher that was involved in the fire.
8      Q.  Did you ask anybody to get
9  information from the homeowner, or
10  anybody else at the house, as to whether
11  they noticed any indication that would be
12  consistent with the problems you
13  mentioned that might increase the
14  vibration?
15      A.  No.
16      Q.  You have no evidence in that
17  regard whatsoever?
18      A.  The evidence that I have of the
19  identified problem with this dishwasher
20  is that which is in my report.
21      Q.  Right.  But you have no evidence
22  as to whether this showed signs of an

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 217

1  dishwasher may be vibrating.
2      Q.  Explain that to me.
3          How big is a junction box?
4      A.  It's about three inches by
5  five inches, or maybe three inches by six
6  inches.
7      Q.  By?
8      A.  By one inch deep or so.
9      Q.  Okay.  If a proper installation,
10  like the installation you believe should
11  have been done was done, would those wire
12  nuts been pressing up against the wall of
13  that -- the interior walls of that
14  junction box?
15      A.  Yes.
16      Q.  What impact does that have, if
17  connected in the manner you think it is,
18  in terms of being attached, either by
19  rivet or by torque screw, to the plastic
20  portion, what amount of vibration would
21  those wire nuts be subjected to if
22  they're touching that wall, or walls?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 218

1    A. They would -- inside the junction
2  box, everything would be moving in the
3  same way that the dishwasher is moving,
4  so there's no relative movement between
5  the wiring conductors and the dishwasher,
6  which is what you want to avoid.
7    **Q. And if the wires were connected**
8  **outside the junction box, in a manner**
9  **which you believe they were connected,**
10 **what vibration would they be subjected**
11 **to?**
12   A. In that case, with the conductors
13 not moving, but the dishwasher moving,
14 you would transmit vibration to the wire
15 nut connections, that would be different
16 from, if everything was moving at the
17 same speed within the junction box, and
18 the conductors are rigidly connected to
19 the junction box, through a Romex clamp.
20   **Q. As opposed to that situation?**
21 **You said you don't believe that a clamp**
22 **was used at all, correct?**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 219

1    A. Correct.
2    **Q. Okay. And wouldn't that be just**
3  **a miniscule amount of vibration?**
4    A. A miniscule amount of vibration
5  over time can be damaging, and, can cause
6  a loosening of components.
7    **Q. How much --**
8    A. Which is the type of thing you
9  definitely don't want to happen in a wire
10 nutted connection.
11   **Q. How much vibration would it be**
12 **required, to separate the wire connection**
13 **that you did see?**
14   A. Since I don't know the condition
15 of the wire nut connections prior --
16   **Q. No. The one you did see I said.**
17   A. Pardon me?
18   **Q. You saw one?**
19   A. Yes.
20   **Q. How much would have been**
21 **necessary to loosen up that connection?**
22   A. I can't quantify it.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 220

1    **Q. Okay. If it was in a wire nut**
2  **with no striation marks, so that loose,**
3  **how quickly would the vibration cause any**
4  **electrical arcing?**
5    A. Again, I can't quantify that.
6    **Q. Do you think it would happen**
7  **relatively immediately? The first use?**
8    A. Not necessarily, no.
9    **Q. What's your scenario?**
10   A. I can't quantify it.
11   **Q. Well, do you have any scenario?**
12   A. Do I have any scenario? Can I --
13 no, I can't predict that.
14   **Q. Well, the reason I'm trying to**
15 **find out this, you don't believe a wire**
16 **nut was tightened at all, correct?**
17   A. It was not properly connected.
18   **Q. Okay. If it's not properly**
19 **connected, how quickly will vibration**
20 **result in a problem?**
21   A. I can't quantify it.
22   **Q. No outside limit?**

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 221

1    A. No, because the level of
2  vibration is not quantified. The amount
3  of tightening of the wire nut is not
4  quantified. It -- it would -- you know,
5  I can't give you a number on that.
6    **Q. You have no evidence or**
7  **information concerning how the wires were**
8  **stripped on the Romex side?**
9    A. No.
10   **Q. Okay. You mentioned before, they**
11 **may have been stripped improperly, but**
12 **you just don't know?**
13   A. That's correct.
14   **Q. Was there any evidence as to how**
15 **they were stripped?**
16   A. No.
17   **Q. Okay. I mean, if you used one of**
18 **those wire strippers, does that leave a**
19 **striation mark?**
20   A. It shouldn't. It shouldn't nick
21 the wire at all.
22   **Q. Okay. Did you look to see if**

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 222

1  there was one?
2      A.  There were no striations of any
3  type.
4      Q.  Was it possible to tell how much
5  of that wire was exposed, prior to the
6  fire?
7      A.  No.
8      Q.  Any insulation was melted well
9  beyond where you'd assume a stripping of
10  insulation removal would happen?
11      A.  Yes.
12      Q.  Okay.  Page 4 of your report,
13  sir, physical evidence in the thermal
14  damage patterns.  Is that simply setting
15  forth Mr. Schaal's opinion?
16      A.  Yes, at the fire scene.
17      Q.  Okay.  You're not rendering any
18  origin burn patterns or thermal damage
19  patterns, are you?
20      A.  Not with regard to the area of
21  origin of the fire, beyond the fact that
22  it was at the dishwasher and the area in

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 223

1  the dishwasher.
2      Q.  Let me look at your three
3  preliminary opinions or conclusions that
4  you listed here.
5      Okay.  Number 1, you say the
6  ignition source was either combustible
7  wiring insulation -- well, you say wiring
8  insulation and combustible material at
9  the base of the dishwasher, including the
10  plastic base and combustible construction
11  materials around the dishwasher.
12      What are these combustible
13  construction materials around the
14  dishwasher?
15      A.  I believe there was a wooden
16  cabinet, or -- yeah, cabinet.
17      Q.  What was the first thing to burn?
18      A.  The insulation on the wiring.
19      Q.  And how do you know that?
20      A.  Because the electrical activity
21  is in a location where the heat would
22  have been generated, and transmitted to

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 224

1  the insulation at the wire nut
2  connection, or, whatever type of
3  connection they had.
4      Q.  Would you have any evidence that
5  the item of first ignition was
6  insulation?
7      A.  Based on the point where the fire
8  originated, that would be the first
9  combustible material.
10      Q.  What is the physical evidence
11  that the first thing to ignite was
12  insulation?  If any?
13      A.  Its -- its proximity to the area
14  where the high resistance heating fault
15  occurred.
16      Q.  All right.  But if there was not
17  a high -- if your theory about a high
18  resistance heating arc is not correct,
19  then you have no physical evidence that
20  insulation was the first thing to ignite,
21  is that correct?
22      A.  I don't have any alternative

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 225

1  theory, no.
2      Q.  No, no.  My question was this:
3  Theories are one thing, evidence is
4  another thing.
5      Do you have any evidence that the
6  item that first burned was insulation?
7      A.  Other than the -- what I've
8  testified to as far as the location of
9  the electrical activity, no.
10      Q.  What does that mean?
11      A.  That means that the heat source,
12  and, therefore, the first item ignited is
13  going to be the electrical insulation on
14  the area where that heat source was.
15      Q.  You're simply saying that it must
16  have been the first thing to burn if your
17  theory is correct?  Is that --
18      A.  It's my opinion that is what the
19  first ignited material is.
20      Q.  But you have no evidence beyond
21  the fact if your theory is correct,
22  that's what you would expect to be the

## BRADFORD ASSOCIATES
### KENNETH MCLAUCHLAN, P.E.

Page 226

1 first thing to burn?
2     A. There is fire damage to those
3 conductors that basically eliminates any
4 other potential ignition.
5     Q. Okay. But is there a fact you
6 can point to me that says: Based on this
7 fact, I can tell you insulation was the
8 first thing to burn?
9     A. The only thing there is, is the
10 physical evidence of the presence of the
11 high resistance heating fault.
12     Q. But my question is: Is there
13 evidence that you can say this is
14 physical evidence, this is a fact, that
15 establishes the first thing to burn was
16 insulation?
17       Your opinion is on the record.
18     A. Yeah. There is no physical
19 evidence that shows that it burned first.
20     Q. Okay. All right. Is there
21 physical evidence that the ignition
22 source was resistance heating?

## BRADFORD ASSOCIATES
### KENNETH MCLAUCHLAN, P.E.

Page 227

1     A. Yes.
2     Q. And an improperly installed wire
3 nut connection?
4     A. Correct.
5     Q. Okay. What's the physical
6 evidence of that?
7     A. The electrical activity on the
8 end of that wire.
9     Q. And you're willing to stand by
10 that opinion from now until the time we
11 are in front of a jury?
12     A. As I state in my report, these
13 conclusions are based on information
14 reviewed to date, and my conclusions are
15 subject to change in the event that I
16 learn something different.
17     Q. Well, sure. But it's been a year
18 and a month, and there's been a ton of
19 discovery and investigations in this
20 case. And we're here paying you a
21 reasonable fee, but, a lot of money, in
22 my opinion, for your opinions. I'm not

## BRADFORD ASSOCIATES
### KENNETH MCLAUCHLAN, P.E.

Page 228

1 saying you're not worth it. I'm just
2 saying here is where we find out what
3 your opinions are for my client and the
4 other client.
5     So, you'd label these
6 preliminary, in the report, but then you
7 say they're to a reasonable degree of
8 engineering certainty.
9     So my question is: Are you
10 willing to stand by that opinion from
11 here, and if we're in front a jury in a
12 week or a month or a year, to then?
13     A. Yes. But at the same time, I'm
14 not going to ignore something that would
15 tell me that my theory is wrong, and I
16 have to consider it at least.
17     Q. Okay. But you haven't to date?
18     A. I haven't seen anything that
19 tells me that my opinion is not correct.
20     Q. Okay. And nothing in the year
21 and month since you did this report,
22 approximately, has caused you to change

## BRADFORD ASSOCIATES
### KENNETH MCLAUCHLAN, P.E.

Page 229

1 that one iota?
2     A. Correct.
3     Q. Number 2, the dishwasher was
4 installed improperly. Okay. When you
5 say installed improperly, when?
6     A. At the time that it was
7 installed, and the wire nut or whatever
8 type of connection was made, in the
9 absence of a junction box and a Romex
10 connector.
11     Q. Okay. Do you have an opinion as
12 to when this improper installation
13 occurred?
14     A. In the absence of any other
15 information, that would be at the time
16 the original installation was done.
17     Q. What evidence supports that view?
18 Upon what evidence do you base that
19 opinion on, I should say?
20     A. I have no evidence that it was
21 ever installed subsequent to the original
22 installation.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 230

1    Q.  And the next portion of that
2  paragraph is what we've talked about at
3  some length now?
4    A.  Yes.
5    Q.  Number 3, says:  The technician
6  that originally installed the dishwasher,
7  as well as the technicians that
8  subsequently serviced the dishwasher,
9  knew, or should have known, it was
10  installed improperly.
11    Okay?
12    A.  Yes.
13    Q.  What information do you have
14  about what the technician, that
15  originally installed the dishwasher, did?
16    As you sit here today, what is
17  that based upon?
18    A.  That's based on my opinion that
19  the original installer followed the
20  installation instructions, or failed to
21  follow them.  And, as a result, failed to
22  properly install the wire nutted

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 232

1  okay.
2    As well as the technician that
3  subsequently serviced the dishwasher knew
4  or should have known that the dishwasher
5  was installed improperly and the improper
6  installation created a fire hazard.
7    That is your last comment?
8    A.  Yes.
9    Q.  Who were these technicians?
10    A.  I have not identified them.
11    Q.  Now, as an engineer, you use your
12  words carefully, I take it, when you put
13  together a report like this?
14    A.  Yes.
15    Q.  And you used the word
16  "technicians," correct?
17    A.  Yes.
18    Q.  How many different technicians do
19  you think actually ever worked on this
20  dishwasher?
21    A.  I don't know how many.  I would
22  assume at least one.

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 231

1  connections, the junction box and the
2  Romex connector.
3    Q.  And what evidence do you have to
4  support that?
5    A.  The installation instructions.
6    Q.  Anything else?
7    A.  The evidence of the electrical
8  activity supports my opinion, where this
9  fire originated.
10    And then the absence of the
11  components that I just described.
12    Q.  And then the next portion of that
13  line is:  The technicians that
14  subsequently serviced the dishwasher
15  knew, or should have known, that this was
16  installed properly, and a fire hazard.
17    I'm showing that's the next part
18  of that sentence, correct?
19    A.  Yes.  But I think you said
20  "properly" and it should read
21  "improperly."
22    Q.  And I meant to say "improperly,"

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 233

1    Q.  Who worked on it?
2    MR. TETRO:  If you know?
3    A.  I don't know the name of the
4  individual.
5  BY MR. BROWN:
6    Q.  What did they do?
7    A.  They would have had to install a
8  Romex branch circuit conductors to the
9  wiring inside, at the base of the
10  dishwasher.
11    Q.  Why do you say they would have
12  had to?
13    A.  Because the dishwasher does not
14  run if there's no power supplied to.
15    Q.  Do you have any evidence that
16  they did that?
17    A.  The evidence, that I'm aware of,
18  is that the dishwasher did run for at
19  least part of the time, before the fire.
20    Q.  Okay.  Do you have any evidence
21  that any technician who has been
22  identified in any point in this case was

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 234

1  in any way responsible for the
2  installation of the Romex, and/or the
3  connections which you believe existed at
4  the time of the fire?
5      A. As I say, I don't know the names
6  of the individuals who made these
7  connections.
8      Q. And there's no evidence of that,
9  that you're aware of, at all?
10     A. As I say, I don't have any --
11  other than the deposition of the
12  gentleman who said that he didn't do the
13  connection, I don't know what other
14  deposition testimony there is out there.
15     Q. Have you asked for that?
16     A. I made a blanket request back
17  when I got involved in this case, to get
18  copies of deposition transcripts.
19     Q. Before you blame either a
20  technician who originally installed, or
21  other technicians that subsequently
22  serviced the dishwasher for a fire,

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 236

1  reasonable degree of engineering
2  certainty, which blames them for this
3  fire?
4      A. Certainly, I would love to have
5  every bit of information that exists
6  about this fire.
7      Q. And yet --
8      A. However, based on what I've been
9  able to determine, as far as the cause of
10  the fire, and knowing that a technician
11  had to have made power connections, I
12  think I have sufficient information to
13  reach the opinions that I've reached.
14     Q. What do you base your belief on,
15  that a technician had to make a power
16  connection?
17     A. Because these dishwashers arrive,
18  and are placed in the house, and they
19  won't run without power.
20     Q. Okay. That answers that
21  question.
22         How do you know it was a

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 235

1  wouldn't it be prudent -- in fact,
2  wouldn't it be responsible to find out
3  exactly what they did?
4      A. Well, in this case, what is
5  important is that they provided power to
6  the dishwasher. And that's really the
7  issue here.
8         And I have no doubt that some
9  technician provided power to this
10  dishwasher, whether I can name him or
11  not.
12        And that's -- that person
13  improperly connected the power that led
14  to this fire.
15     Q. My question was a little
16  different.
17        If you're going to point the
18  finger at a technician, or technicians,
19  and there's information available as to
20  what some or all of the technicians did,
21  wouldn't you want to know what that was,
22  before you reach an opinion, to a

BRADFORD ASSOCIATES
KENNETH MCLAUCHLAN, P.E.

Page 237

1  technician who did that?
2      A. I am making the assumption that
3  someone, who knew how to install
4  electrical appliances, did the work.
5      Q. Why are you making that
6  assumption?
7      A. Because that is what I have been
8  lead to believe.
9      Q. By whom?
10     A. That a commercial firm had made
11  this installation.
12     Q. By whom have you been lead to
13  believe that? Mr. Utke?
14     A. Mr. Schaal.
15     Q. Who?
16     A. Mr. Schaal.
17     Q. What did Mr. Schaal say about
18  that?
19     A. He provided me the information
20  that I indicate in the beginning of my
21  report.
22     Q. Where does he indicate that,

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 238

1  that's noted in your report?
2      A. Where it says:  It was recorded
3  the subject dishwasher was purchased
4  from, and installed by Foremost
5  Appliances on/or about June 6, 2003.
6      Q. Okay. The installer, to your
7  knowledge, was Foremost Appliance?
8      A. That's correct.
9      Q. And you believe that if an
10  appliance provider, such as Foremost
11  Appliance, who performed this work, they
12  were negligent and caused this fire?
13      A. If they performed this
14  installation of the power connections,
15  that's correct.
16      Q. Okay. Do you have any
17  information beyond that, as to anybody
18  who installed, or made this power
19  connection?
20      A. As I previously testified, I
21  can't name the individual, no.
22      Q. Okay. Well, in your report, at

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 240

1  improper connection, that you believe
2  existed, was?
3      A. Yes.  If they were diagnosing the
4  dishwasher, and, particularly if they
5  were looking at the pump, they would have
6  had to observe the power connection.
7      Q. You have the ANOVA document in
8  your file, that you identified earlier?
9      A. Yes.
10      Q. And then you also say:  BOSCH
11  representatives reportedly repaired the
12  subject dishwasher?
13      A. Yes.
14      Q. Do you know what they did during
15  that repair?
16      A. I don't know the details, no.
17      Q. Do you know if that repair would
18  have put them in a position where they
19  would have, or should have seen this
20  Romex cable in the manner in which you
21  believe it was installed and connected?
22      A. If they, in fact, replaced the

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 239

1  least from Mr. Schaal, you then mention
2  ANOVA, who apparently went out and looked
3  at it, correct?
4      A. Yes.
5      Q. Do you believe ANOVA did
6  anything? Saw anything? Should have
7  done anything?
8      A. They also should have observed
9  the improper installation of power
10  connections.
11      Q. Even if they weren't going to
12  make the repair themselves that day?
13      A. Yes.
14      Q. What should they have done?
15      A. They should have notified the
16  homeowner that the dishwasher was
17  installed improperly, and that there was
18  a fire hazard.
19      Q. And do you believe what they did,
20  in terms of their diagnosis of the
21  problem, would have necessarily required
22  them to observe this area where this

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 241

1  pump motor, then yes.
2      Q. And with respect to what you
3  believe to be the connection, or at least
4  the range of possible connections that
5  support your theory, do you believe that
6  is something that even any marginally
7  competent electrician or technician would
8  have done?
9      A. Yes.  The National Electric Code
10  is very clear.  The protection has to be
11  provided for any, what they refer to as
12  pressure connections inside of a junction
13  box, to prevent strain from being
14  transmitted and scuffing.
15      Q. Okay.  Well, I think you may have
16  misunderstood my question.
17      What I'm saying is:  You
18  understand -- you have a picture in your
19  mind, anyway, of what you believe existed
20  just prior to that fire, right?
21      A. Yes.
22      Q. Okay.  Do you believe that what

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 282

1  looking at this photo?
2      A. I mean it has the outline of
3  something that appears to be a junction
4  box of some sort.
5      Q. See these clips that are on the
6  inside?
7      A. Yes.
8      Q. Of that cabinet, are those the
9  types of clips that you'd expect BX cable
10  be run through, from looking at them?
11      A. They could be used for that
12  purpose, yes.
13      Q. Would they be used for Romex,
14  those types of clips?
15      A. No. Typically, Romex would be
16  used with staples.
17      Q. Also, take a look at -- these are
18  photographs -- I'm sorry, that were
19  attached to the report of Mr. Benedict.
20  And I'd like you to take a look at
21  Photograph 44, and let me know if you can
22  tell what -- what that is in photograph

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 283

1  44?
2      A. 44 appears to -- well, I'd have
3  to see it again.
4      Q. Let me ask you this: Can you
5  tell if it's the capacitor or not?
6      A. It looks like the capacitor,
7  based on the bolt on the end there. But
8  I'd really need to see a little more
9  context to identify it for certain.
10      Q. Okay. If I told you it was the
11  capacitor, would you disagree with me? I
12  mean is there anything about that photo
13  that would make you disagree with me?
14      A. Again, I prefer to see it.
15      Q. Aside from the fact that I'm a
16  lawyer that represents a different party
17  in the case?
18      A. (Laughter.) I'm sure that has
19  nothing to do with it.
20      Q. Take a look now at photo 41. Can
21  you tell if that's the capacitor? Is
22  that a better photo?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 284

1      A. To me, it does look like the
2  capacitor, because of the shape of the
3  melting that occurred on it.
4      Q. Okay. And when you pointed --
5  you just pointed at the shape of the
6  melting that occurred. You pointed -- in
7  this photo, the way it's oriented, the
8  bottom has sort of a dent in it, right?
9      A. Yes.
10      Q. Okay. If you look at the
11  right-hand end of the capacitor, does it
12  appear to be open to you?
13      A. Yes.
14      Q. Okay. And if you look somewhere
15  towards the center of the capacitor, here
16  on the bottom center of it, does that
17  appear to be a hole in the capacitor
18  shell itself?
19      A. Yes.
20      Q. Okay. Take a look at photo 45
21  for me, Mr. Benedict's report. Can you
22  tell me what that is?

## BRADFORD ASSOCIATES
## KENNETH MCLAUCHLAN, P.E.

Page 285

1      A. Again, that appears to be the
2  electrolytic capacitor.
3      Q. Does it appear to have a hole in
4  it, in the center of the capacitor there?
5  Can you tell from the photo?
6      A. There is a shadow there, where
7  you're trying to point.
8      Q. Okay. Now, if we go back to
9  photo 44, and just assume for me this is
10  the capacitor, okay. Can you see, on the
11  right-hand side of the capacitor, an
12  opening or a hole?
13      A. Yes.
14      Q. Now, that end would normally be
15  sealed, correct?
16      A. Yes.
17      Q. Okay. And your position, if I
18  understand it, is that those openings, or
19  those holes in the capacitor, were caused
20  by the heat from the fire itself,
21  correct?
22      A. Correct.