# EXHIBIT 11

BRADFORD ASSOCIATES
ANDREW KERR

Page 22

1    A  Designer and conduit between everyone and
2  Beverly Bernstein.
3    Q  Did you yourself ever talk with Mrs.
4  Bernstein directly?
5    A  Briefly and usually not about job-related
6  issues.
7    Q  Would you have talked to anyone else besides
8  Mrs. Rubino or Margaret Rubino with regard to anything
9  dealing with renovation in order to get things back to
10 Mrs. Bernstein, so to speak?  In other words, was
11 there any other conduit besides Margaret Rubino for
12 Mrs. Bernstein on the project?
13   A  If I was trying to communicate with Mrs.
14 Bernstein, no.
15   Q  Are you familiar with Paul Scuderi, Inc.?
16   A  Yes.
17   Q  What is your understanding of Paul Scuderi?
18   A  Electrical contractor.
19   Q  What is your understanding of his
20 involvement, if any, with the kitchen renovation
21 project?
22   A  They handled all the electrical work.

BRADFORD ASSOCIATES
ANDREW KERR

Page 23

1    Q  What makes you say that?
2    A  Because they were contracted to do the
3  electrical work?
4    Q  Contracted by whom?
5    A  I believe by Beverly Bernstein, but it may
6  have been by Margaret and Sal.  I don't know.
7    Q  So it is either Mrs. Bernstein directly or
8  Margaret or Sal on Mrs. Bernstein's behalf?
9    A  Correct.
10   Q  Were there any other electricians involved
11 with the kitchen renovation project as far as you
12 know?
13   A  Not to my knowledge, no.
14   Q  So as far as you understand it, Paul Scuderi
15 would have been the only electrician on the renovation
16 project?
17   A  Correct.
18   Q  Did you yourself ever talk directly with Mr.
19 Scuderi?
20   A  Yes.
21   Q  We'll get to that in a minute, actually, now
22 that I think about it.

BRADFORD ASSOCIATES
ANDREW KERR

Page 24

1        If you talked with Mr. Scuderi, was it ever
2  in person or just by phone?
3    A  It was in person.
4    Q  Would he be at the job site when you would be
5  at the job site, then?
6    A  I remember crossing paths, but it tended to
7  be more like meeting out front or whatever or walking
8  through together and making sure that -- from a
9  scheduling perspective.
10   Q  Do you know if there was anyone else working
11 under Scuderi's employ, I guess, with Paul Scuderi,
12 Inc., other than Mr. Scuderi that was at the project?
13   A  I don't know.  I didn't ever actually see any
14 work taking place.  It was just meeting with Paul.
15   Q  So you never saw Mr. Scuderi or Paul Scuderi
16 do any electrical work at the site?
17   A  No.
18   Q  You would see him at the site, but not doing
19 any work?
20   A  Correct.
21   Q  If you could characterize how many times
22 roughly you may have seen him at the site during the

BRADFORD ASSOCIATES
ANDREW KERR

Page 25

1  six-month project --
2    A  I couldn't tell you.  I don't recall.
3    Q  -- seven-month project.
4        The conversations you had in person with him,
5  were they really just about scheduling, basically?
6    A  Yes or nonwork-related issues.
7    Q  What specifically about scheduling would you
8  have talked with him about?  I just want to understand
9  that.
10   A  Basically, it would have been to let him know
11 that we were completed with framing, for example.  And
12 that the space was ready for him to go in and wire.
13   Q  What do you mean by that?  Go into more
14 detail.
15   A  What do I mean by what?
16   Q  The space that was ready to be wired, what
17 are you referring to?
18   A  Essentially, we did the demolition.  Then
19 there may have been -- and to be honest with you, I
20 can't recall if there was or not, but it most likely
21 would have been some very minor framing required.
22       And if there was, he would want that done

BRADFORD ASSOCIATES
ANDREW KERR

Page 30

1  connected to a power source.
2       Usually, the way that happens is that a tail,
3  essentially, is put on the dishwasher or any other
4  appliance, electrical appliance, for that matter, and
5  run into a junction box.
6     Q  Do you have any personal knowledge about who
7  made the connection, the hardwire connection between
8  the dishwasher power wiring and the house circuit
9  wire?
10    A  Between the dishwasher and the house?  No.
11    Q  Am I correct in saying that's what hardwiring
12 means, making those connections?
13    A  Yeah.  That, generally, yes.
14    Q  But you have no personal knowledge of who
15 actually made that connection?
16    A  No.
17    Q  What would be your understanding of who of
18 all the parties involved, the subcontractors involved
19 with this project, who would be assigned the
20 responsibility for making that connection?
21       MR. REGO:  Objection to the form of the
22 question.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ANDREW KERR

Page 31

1       MR. NOBLE:  The form of the question is
2  rather confusing.
3       BY MR. TETRO:
4     Q  Let me rephrase it, then.  What is your
5  understanding of who should have been responsible for
6  making that connection?
7       MR. REGO:  Objection to the form of the
8  question.  Calls for a legal conclusion.  Also calls
9  for speculation.
10      MR. BROWN:  Objection.
11      BY MR. TETRO:
12    Q  You can answer.
13      MR. NOBLE:  You can answer if you can.
14      THE WITNESS:  My opinion?  Is that what you
15 are asking for, my opinion of whom should have been
16 responsible for --
17      BY MR. TETRO:
18    Q  Based on the fact that you were project
19 manager for this job and your years of experience --
20    A  The electrician.
21      MR. REGO:  Move to strike the answer.
22      MR. UTKE:  Let me ask it differently.  Do

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ANDREW KERR

Page 32

1  you have an understanding of who was going to connect
2  the electric to the dishwasher?
3       THE WITNESS:  The electrician.
4       BY MR. TETRO:
5     Q  What makes you say that?  It may be obvious,
6  but just put it on the record anyway.
7     A  If it's electrical work, it is done by the
8  electrician.
9     Q  Would the hard wiring of the dishwasher in
10 your opinion have to be done by a licensed
11 electrician?
12    A  Should be, yes.
13    Q  Now, you mentioned before about you had
14 spoken with Mr. Scuderi in person.  Did you ever speak
15 to him by phone?
16    A  Yes.
17    Q  And when would you have called him or how
18 many times would you have called him?
19    A  I couldn't tell you.  I don't know.
20    Q  Do you remember the purpose of any of those
21 phone calls?
22    A  It would have been -- and based on

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ANDREW KERR

Page 33

1  experience, not on a specific recollection, but it
2  would have been based on scheduling.
3     Q  Again, just saying, I have gotten this amount
4  of work done, it is ready for you to do your work?
5     A  Correct.
6     Q  Did you ever have a conversation with him in
7  which you indicated that appliances are ready to be
8  hooked up?
9     A  I don't recall a specific conversation, no.
10    Q  Is that a conversation you could have had,
11 though?
12    A  Sure.
13      MR. REGO:  Objection.
14      BY MR. TETRO:
15    Q  The testimony of Chris Landis deposed back in
16 April of '07, and I can just read this into the
17 record, if that's fine with everyone here, it is a
18 transcript --
19      MR. NOBLE:  Help yourself.
20      MR. TETRO:  Page 29.
21      MR. REGO:  Is there a question pending?
22      MR. TETRO:  I'm going to read into the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Email: BDRASSOC@AOL.COM -- Web: BRADFORDASSOCIATES.COM

BRADFORD ASSOCIATES
ANDREW KERR

Page 38

1  Q  The phone calls you made with regard to
2  scheduling, did you ever make any sort of written
3  notes about those?
4     A  I may have. But I don't know where they are
5  at this point. I'm actually surprised those are in
6  there.
7     Q  Is that something you typically do if you
8  make a phone call, that you jot it down, memorialize
9  it on a piece of paper?
10    A  No.
11    Q  But it is possible you may have made notes of
12 conversations you had with Mr. Scuderi and just don't
13 have them available?
14    A  Very unlikely.
15    Q  Do you know if anyone else from Landis made
16 any phone call or ever notified Paul Scuderi that the
17 appliances were to be hooked up?
18    A  No.
19    Q  Did anyone ever notify you or anyone at
20 Landis that the dishwasher had been hooked up?
21    A  I don't recall.
22    Q  Should someone have ever notified you about

BRADFORD ASSOCIATES
ANDREW KERR

Page 39

1  that?
2     A  It would have been -- it is my job to go by
3  and see if things have happened or not. So I would
4  have been the one calling myself, theoretically, I
5  guess.
6     Q  But you are not involved with the connection
7  of the dishwasher, so to speak?
8     A  I'm not involved with the electrical
9  connection.
10    Q  Correct?
11    A  No.
12    Q  But you are eventually going to make sure it
13 works after the fact?
14    A  Correct.
15    Q  Are you just going to go to the site and will
16 see that it's in there and then make sure it works?
17 Is that basically it?
18       MR. NOBLE: Objection. Asked and answered.
19 You may answer.
20       THE WITNESS: Yes.
21       BY MR. TETRO:
22    Q  Does Landis have any responsibility for

BRADFORD ASSOCIATES
ANDREW KERR

Page 40

1  notifying any of the subcontractors including Scuderi
2  that appliances are ready to be hooked up?
3     A  Sure.
4     Q  They do? Okay. What makes you say that?
5     A  They wouldn't know that they needed to come
6  do their work unless our work had been done prior to
7  it.
8     Q  So even though you have no specific
9  recollection of making a phone call regarding this
10 issue of telling Mr. Scuderi that the dishwasher or
11 any of the appliances, for that matter, are ready to
12 be hooked up, is it possible you still may have told
13 him that?
14    A  Oh, absolutely.
15    Q  And is it unlikely that no one else would
16 have made this conversation; it would just have been
17 you because you are the project manager?
18    A  Correct.
19    Q  So, in essence, you just have no specific
20 recollection of that phone call?
21    A  Exactly.
22    Q  But it is highly likely or is it just

BRADFORD ASSOCIATES
ANDREW KERR

Page 41

1  possible that you made the phone call?
2     A  Highly likely that I made the phone call.
3     Q  Okay. Now, is that something you do on most
4  jobs that you work on?
5     A  Correct.
6     Q  So it is part of your job duties?
7     A  Yes.
8     Q  So you probably do it so often that it is not
9  something you would specifically recall on a
10 particular job?
11    A  Exactly.
12       MR. TETRO: One more thing I want to mark, it
13 is in your packet, is the fax, March 19, 2003.
14       (Thereupon, Deposition Exhibit No. 3 was
15 marked for identification.)
16       MR. TETRO: It is to Chris from Sal.
17       BY MR. TETRO:
18    Q  Have you ever seen this document before?
19    A  I may have, but I don't have a recollection
20 of it.
21    Q  Under the Electrician, it the second section
22 there, it says, The question of whom to use is still

BRADFORD ASSOCIATES
ANDREW KERR

Page 46

1    And because of that path, I did not feel it
2    necessary to pull the cover off the dishwasher and
3    check the connection.
4    Do you agree with that characterization of it
5    being customary that other people can make the
6    connection?
7    MR. REGO: I'm going to object to the form
8    of the question. It calls for basically opinion. And
9    it's not in the purview of this witness to agree or
10   disagree with the testimony of any other witness.
11   That being said, you can answer the question.
12   BY MR. TETRO:
13   Q  As a project manager, I'm thinking you may
14   have some information or --
15   A  Just so I understand the question, you are
16   asking me whether I have seen that happen before,
17   whether I would be not -- whether the level of
18   difficulty of doing this is --
19   Q  Let me make it two questions. The first
20   question is do you agree that it is customary?
21   A  No.
22   Q  And the second question is do you agree that

BRADFORD ASSOCIATES
ANDREW KERR

Page 47

1    it would be proper?
2    MR. REGO: Objection to the form of the
3    question.
4    THE WITNESS: Proper in what sense? Improper
5    or proper?
6    BY MR. TETRO:
7    Q  Well --
8    A  Either way.
9    Q  Well, is it improper, I guess, in other
10   words, for a licensed electrician who is hired and
11   charges to make a connection to leave that connection
12   to be done by someone else?
13   MR. REGO: Objection. Assumes facts in
14   evidence. Calls for an opinion. You can answer the
15   question.
16   THE WITNESS: I think it would be
17   objectionable for anyone to get paid for something
18   that they didn't do even though they were supposed to.
19   MR. REGO: Move to strike. Nonresponsive.
20   BY MR. TETRO:
21   Q  But if he is the only electrician hired for
22   the job, is it improper for him to leave that task for

BRADFORD ASSOCIATES
ANDREW KERR

Page 48

1    someone else?
2    MR. REGO: Same objection. Calls for an
3    opinion.
4    BY MR. TETRO:
5    Q  Based on your experience as a project
6    manager.
7    MR. REGO: Same objection.
8    THE WITNESS: Yes. Probably if he didn't do
9    it, it wouldn't happen.
10   MR. TETRO: That's all I have. Thank you.
11   The other attorneys may have questions.
12   EXAMINATION BY COUNSEL FOR PLAINTIFF FEDERAL
13   INSURANCE
14   BY MR. UTKE:
15   Q  Mr. Kerr, my name is Mark Utke. I also
16   represent one of the plaintiffs in the case. It is
17   the insurance carrier that insured the contents of the
18   Bernstein residence?
19   I'll jump around a bit. But some of the
20   questions are just follow ups to the other questions
21   he had.
22   Now, you worked for Centex in Florida for two

BRADFORD ASSOCIATES
ANDREW KERR

Page 49

1    years?
2    A  Uh-huh (Affirmative).
3    Q  Why was it that you left Centex?
4    A  Actually, I was down in Florida because my
5    wife was in medical school or my now wife, then not
6    wife was in medical school.
7    Q  Why didn't I think of doing that. So it was
8    just --
9    A  Personal issues.
10   Q  -- geographic?
11   A  Right.
12   (Thereupon, a comment was made off the
13   record.)
14   BY MR. UTKE:
15   Q  Prior to your Deposition, we went over some
16   of the documents you reviewed. That's it, the packet
17   in front of you?
18   A  Uh-huh (Affirmative).
19   Q  Have you looked at any photographs of the
20   loss scene?
21   A  I think I did at one point. I don't recall
22   now.